UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| WAYNE COTE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:10-cv-00481-JAW |
| | ) | |
| TOWN OF MILLINOCKET, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON MOTIONS FOR SUMMARY JUDGMENT**

Late Halloween afternoon in 2008, town of Millinocket Police Officers Kevin Ingersoll, Janet Theriault and Jerry Cox pulled over, tased, and arrested Wayne Cote for allegedly committing a criminal trespass. Concluding that there is a genuine issue of material fact as to whether the Officers had probable cause to stop and arrest Mr. Cote, the Court declines to grant summary judgment for arresting Officers. The Court grants summary judgment, however, in favor of the town of Millinocket and Chief Donald Bolduc because Mr. Cote has not generated a genuine issue of material fact regarding his claims against the Town and the Chief.

I.    **STATEMENT OF FACTS**

A.    **Procedural History**

On October 29, 2010, Wayne Cote filed a complaint in Maine Superior Court for Penobscot County against the town of Millinocket and four of its police officers, Kevin Ingersoll, Janet Theriault, Jerry Cox and Don Bolduc, alleging that the

Defendants committed a series of civil violations against him when they arrested him on October 31, 2008.  *State Ct. Record* Attach. 1 *Compl.* (ECF No. 3).  On November 23, 2010, the Defendants removed the case to this Court and filed an answer.  *Notice of Removal* (ECF No. 1); *Defs.' Town of Millinocket, Kevin Ingersoll, Janet Theriault, Jerry Cox and Donald Bolduc's Ans., Defenses, and Affirmative Defenses to Pl. Wayne Cote's Compl. and Req. for Jury Trial* (ECF No. 4).  On February 24, 2011, Mr. Cote filed an amended complaint and on February 28, 2011, the Defendants filed an answer.  *First Am. Compl.* (ECF No. 13) (*Am. Compl.*); *Ans., Defenses and Affirmative Defenses to Pl. Wayne Cote's First Am. Compl. and Req. for Jury Trial of Defs. Town of Millinocket, Kevin Ingersoll, Janet Theriault, Jerry Cox and Donald Bolduc* (ECF No. 14) (*Defs.' Am. Ans.*).

On February 6, 2012, each Defendant moved separately for summary judgment.[1]  *Def. Town of Millinocket Mot. for Summ. J.* (ECF No. 57) (*Town Mot.*); *Def. Kevin Ingersoll's Mot. for Summ. J.* (ECF No. 58) (*Ingersoll Mot.*); *Def. Jerry Cox Mot. for Summ. J.* (ECF No. 59) (*Cox Mot.*); *Def. Donald Bolduc's Mot. for Summ. J.* (ECF No. 60) (*Bolduc Mot.*); *Def. Janet Theriault's Mot. for Summ. J.* (ECF No. 61) (*Theriault Mot.*).  They also filed a joint statement of material facts. *Jt. Stip. Statement of Material Facts for Purposes of Defs.' Mots. for Summ. J.* (ECF No. 62) (JSSMF).  On March 9, 2012, the Defendants filed a statement of material fact.  *Statement of Material Facts of Defs. Town of Millinocket, Donald Bolduc, Jerry Cox, Kevin Ingersoll and Janet Theriault* (ECF No. 65) (DSMF).

---

[1]      This is the parties' second attempt at summary judgment.  After a conference of counsel, the Court dismissed the motions without prejudice on January 6, 2012 due to a variety of problems with their first attempt.

On March 19, 2012, Mr. Cote separately responded to each motion. *Pl.'s Reply to Def. Donald Bolduc's Mot. for Summ. J.* (ECF No. 68) (*Pl.'s Bolduc Opp'n*); *Pl.'s Reply to Def. Jerry Cox's Mot. for Summ. J.* (ECF No. 69) (*Pl.'s Cox Opp'n*); *Pl.'s Reply to Def. Kevin Ingersoll's Mot. for Summ. J.* (ECF No. 70) (*Pl.'s Ingersoll Opp'n*); *Pl.'s Opp'n to Def. Janet Theriault's Mot. for Summ. J.* (ECF No. 71) (*Pl.'s Theriault Opp'n*); *Pl.'s Reply to Def. Town of Millinocket's Mot. for Summ. J.* (ECF No. 72) (*Pl.'s Town Opp'n*).  He also responded to the Defendants' Statement of Material Facts and posited his own Statement of Additional Material Facts. *Pl.'s Opposing Statement and Statement of Additional Facts* (ECF No. 73) (PRDSMF; PSAMF).

On April 2, 2012, each Defendant replied separately. *Def. Don Bolduc's Reply Mem. of Law* (ECF No. 79) (*Bolduc Reply*); *Def. Jerry Cox's Reply Mem. of Law* (ECF No. 80) (*Cox Reply*); *Def. Kevin Ingersoll's Reply Mem. of Law* (ECF No. 81) (*Ingersoll Reply*); *Def. Town of Millinocket's Reply Mem. of Law* (ECF No. 82) (*Town Reply*); *Def. Janet Theriault's Reply Mem. of Law* (ECF No. 83) (*Theriault Reply*). On April 2, 2012, the Defendants filed a joint response to Mr. Cote's statement of additional material facts. *Reply to Material Facts and Additional Material Facts of Defs. Town of Millinocket, Kevin Ingersoll, Janet Theriault, Jerry Cox and Donald Bolduc* (ECF No. 78) (DRPSAMF).

### B.   Statement of Facts

### 1.   Wayne Cote

Wayne Cote is a resident of the town of Millinocket.  JSSMF ¶ 1.[2]  From elementary school through high school, Mr. Cote attended special education classes. *JSSMF* ¶ 2.  Wayne Cote attended Stearns High School and was graduated in 1991. JSSMF ¶ 3.  Mr. Cote has a history of back and neck injuries and a history of closed head injuries.  JSSMF ¶ 4.  Mr. Cote was prescribed medication used for attention deficit disorder and medication for chronic pain.  JSSMF ¶ 5.

Wayne Cote has a lengthy arrest record with the Millinocket Police Department.  JSSMF ¶ 6.  Mr. Cote had numerous interactions with various Millinocket Police officers, and official records do not always reflect every officer who was present at each interaction.  JSSMF ¶ 7.  A number of the charges against Mr. Cote resulting from arrests by the Millinocket Police Department were dismissed.  JSSMF ¶ 8.  Mr. Cote was acquitted of at least two charges that were brought against him as a result of Millinocket Police Department arrests.  JSSMF ¶

---

[2]      The parties submitted a Joint Stipulated Statement of Material Facts consisting of 310 paragraphs.  JSSMF ¶¶ 1-310.  Next, the Defendants submitted an identical Statement of Material Facts consisting of the same 310 paragraphs with record citations.  DSMF ¶¶ 1-310.  Surprisingly, even though the Defendants' Statement of Material Facts exactly tracks the Stipulation of Facts, the Plaintiff qualified his responses to some of the Defendants' paragraphs.  PRDSMF ¶¶ 31, 32, 46-48, 50, 51, 96, 97, 119, 198.  The Plaintiff's contradiction between the facts in the Stipulation and the qualified responses to those same facts has "caught the Court in the middle of [ ] [his] own factual dispute." *Newton v. LePage*, 1:11-cv-00124-JAW, 2011 U.S. Dist. LEXIS 155118, at *3-4 (D. Me. Nov. 8, 2011).  The Court is obligated to give effect to the parties stipulation.  *See Judge Hornby's Civil Jury Instructions* at 2 ("'Stipulated facts' means there is no controversy or dispute about their existence.  You must regard and treat them as proven facts in the case").  At the same time, the Court is required to view "all facts and reasonable inferences therefrom in the light most favorable to . . . the nonmoving part[y]." *White v. R.M. Packer Co.*, 635 F.3d 571, 575 (1st Cir. 2011).  The Court has done its best to determine whether the Plaintiff's qualified responses to his own stipulated facts are truly substantive but where there is a conflict, the Court has enforced the Stipulation over the qualification.

9.  The District Attorney declined to prosecute a number of the charges that were brought as a result of Millinocket Police Department arrests of Mr. Cote.  JSSMF ¶ 10.  Mr. Cote was anxious and fearful of the Millinocket Police Department.  JSSMF ¶ 11.  Sergeant Jerry Cox estimated Mr. Cote's height at 5' 7" and his weight at from 145 to 170 lbs.  JSSMF ¶ 12.

### 2.    Jerry Cox

Jerry Cox was employed as a reserve officer by the town of Medway, Maine in June 1991.  JSSMF ¶ 13.  Before his initial employment as a police officer by the town of Medway, Sergeant Cox completed the 100 hour Reserve Officer Training Course at the Maine Criminal Justice Academy.  JSSMF ¶ 14.  In May 1992, Sergeant Cox accepted a position as a temporary full-time officer with the town of Medway.  JSSMF ¶ 15.  Before accepting full-time employment, Sergeant Cox had been enrolled in a law technology program at the University of Maine at Bangor for two years.  JSSMF ¶ 16.  During his tenure in Medway, no complaints were filed against Sergeant Cox.  JSSMF ¶ 17.

In approximately September 1992, Sergeant Cox became employed by the town of Millinocket as a reserve officer/animal control officer.  JSSMF ¶ 18.  In February 1994, Sergeant Cox became a full-time officer for the town of Millinocket. JSSMF ¶ 19.  In 1995, approximately one year after being hired, Sergeant Cox attended the Maine Criminal Justice Academy and received certification as a full-time police officer.  JSSMF ¶ 20.  In September 1998, Sergeant Cox voluntarily resigned his full-time position at the town of Millinocket but maintained his status

as a reserve officer for the Town.  JSSMF ¶ 21.  Between 1992 and 1998, Sergeant Cox testified that only one citizen complaint came to mind; it was as a result of his use of handcuffs while effecting an arrest.  JSSMF ¶ 22.  Sergeant Cox could not recall any disciplinary action taken against him from September 1992 to September 1998.  JSSMF ¶ 23.

In 2001, Sergeant Cox returned to full-time employment as a police officer for the town of Millinocket.  JSSMF ¶ 24.  In 2004, Sergeant Cox became acting sergeant and in 2005, he became sergeant in the Millinocket Police Department. JSSMF ¶ 25.

On June 4, 2008 by signing a sign-in sheet, Sergeant Cox acknowledged that he had read the Millinocket Police Department's ECW Policy.  JSSMF ¶ 109.  One June 12, 2006, Sergeant Cox was certified as an End-User of the Taser X26. JSSMF ¶ 110.  On November 25, 2008, Sergeant Cox received Taser X26 recertification. JSSMF ¶ 111.

The Millinocket Police Department requires its officers to undergo annual training.  JSSMF ¶ 27.  Sergeant Cox received a passing grade of 80% on fourteen quizzes between June 2007 and June 2009.  JSSMF ¶ 28.  Sergeant Cox was a superior officer in the Millinocket Police Department to Officer Ingersoll on October 31, 2008.  JSSMF ¶ 29.  Sergeant Cox is 5' 9" tall and weighs 260 pounds.  JSSMF ¶ 33.

Sergeant Cox did not recall any interactions with Mr. Cote as a police officer before October 31, 2008.  JSSMF ¶ 30.  The Millinocket Police Department records

reflect that Sergeant Cox's interaction with Mr. Cote before October 31, 2008 was limited to an arrest for Criminal Trespassing and Disorderly Conduct on April 21, 2008.[3]  JSSMF ¶ 31.  Sergeant Cox estimated that as a police officer for the town of Millinocket, he has used takedown moves approximately 100 times.[4]   JSSMF ¶ 32; *but see* DSMF ¶ 32; PRDSMF ¶ 32; PSAMF ¶ 317; DRPSAMF ¶ 317.  Sergeant Cox is 5'9" tall and weighs 260 pounds.  JSSMF ¶ 33.

### 3.    Kevin Ingersoll

---

[3]      Mr. Cote interposed a qualified response to this paragraph.  PRDSMF ¶ 31.  He says that the record citation referenced in the paragraph "only reflects that Sergeant Cox is listed as being the responsible officer in an arrest of Mr. Cote on April 21, 2008."  PRDSMF ¶ 31.  In the Defendants' Statement of Material Facts, they cite for support Officer Cox's Interrogatory Answer paragraph 16, which says that the Officer does "not recall any other interaction with Mr. Cote other than those set forth in the arrest log concerning events in April 2008."  DSMF ¶ 31 Attach. 23, *Def. Jerry Cox's Ans. to Pl.'s Inter.* ¶ 16.  The Defendants attached a copy of Mr. Cote's arrest record with the Millinocket Police Department, but the arrest record makes no mention of an April 21, 2008 arrest for criminal trespass and disorderly conduct.  DSMF ¶ 32 Attach. 24, *Millinocket Police Dep't Arrest Record*.  When the Defendants responded to the Plaintiff's paragraph 321, they noted that the Plaintiff had already admitted the contents of the Stipulation.  DRPSAMF ¶ 321.  Ordinarily, the Court would not consider this paragraph because it is not supported by the record citation.  However, here, despite his qualified response, Mr. Cote stipulated to the contents of the paragraph and therefore the Court gives effect to the Stipulation over the qualified response.

[4] The parties argue about facts to which they have stipulated.  Paragraph 32 of the Stipulation reads:

> Sergeant Cox estimated that as a police officer for the town of Millinocket, he has used takedown moves approximately 100 times.

JSSMF ¶ 32.  Mr. Cote interposed a qualified response to his own stipulated fact, noting that Sergeant Cox testified that he had used "significant physical force," including "submission holds, the use of pepper spray and the use of electronic control weapons."  PRDSMF ¶ 32.  In his statement of material facts, the Plaintiff proposed that "Defendant Cox has used significant physical force approximately 100 times against suspects while employed as a Millinocket Police Officer, including takedown moves, submission holds, use of pepper spray, and use of electronic control weapons."  PSAMF ¶ 317.  In response, the Defendants objected, contending that the Plaintiff's record citation does not mention pepper spray and electronic control weapons and noting that this statement contradicts the stipulations.  DRPSAMF ¶ 317.

The Court reviewed the record citation in dispute and concludes that although it is likely that in his estimate of 100, Sergeant Cox was referring to takedown moves, submission holds and other similar techniques, Mr. Cote stipulated that Sergeant Cox estimated that he had used takedown moves approximately 100 times and the Court gives effect to the stipulation over the qualified response and contradictory proposal.

Officer Ingersoll graduated from the Maine Criminal Justice Academy's 100 hour Part-Time Reserve Law Enforcement Officer Training Course in 1993. JSSMF ¶ 36. Officer Ingersoll worked as a part-time reserve police officer for the town of Bar Harbor from 1993 to 1997. JSSMF ¶ 37. Officer Ingersoll testified that he did not believe any complaints were filed against him while he was employed as a police officer by the town of Bar Harbor. JSSMF ¶ 38. Officer Ingersoll also testified that he did not believe he received any reprimands while employed as a police officer for the town of Bar Harbor. JSSMF ¶ 39. From 1997 until 1999, Officer Ingersoll was employed as a part-time reserve officer by the Mount Desert Police Department. JSSMF ¶ 40.

In 1999, the town of Millinocket hired Officer Ingersoll as a part-time reserve police officer and in April 2005 it hired him as a full-time police officer. JSSMF ¶ 41. In August 2005, Officer Ingersoll attended the eighteen week, Maine Criminal Justice Academy Law Enforcement Officer Certification Course and received certification as a full-time police officer. JSSMF ¶ 42. Officer Ingersoll was required to attend the Maine Criminal Justice Academy course as a condition of his full-time position. JSSMF ¶ 43. Officer Ingersoll's training at the Maine Criminal Justice Academy included courses in traffic law, criminal law, civil law, firearms training, use of force, vehicle stops, dealing with the elderly and dealing with the mentally handicapped. JSSMF ¶ 44. Officer Ingersoll scored minimum passing grades on 22 quiz scores taken between December 2006 and June 2009. JSSMF ¶ 53. Officer Ingersoll scored a minimum grade on the "Awareness of People with

Mental Retardation Quiz." JSSMF ¶ 54. Officer Ingersoll is 6' 2" tall and weighs 225 pounds. JSSMF ¶ 69.

At the time of Mr. Cote's arrest, on October 31, 2008, Chief Bolduc believed that Kevin Ingersoll was an honest person.[5] JSSMF ¶ 96. Because of the facts gleaned from an unrelated internal investigation occurring after October 31, 2008, Chief Bolduc now has reason to believe that Officer Ingersoll is not an honest person. JSSMF ¶ 97. In his deposition testimony, Defendant Bolduc states that with respect to Defendant Ingersoll, things were brought to Bolduc's attention that he investigated; that through his investigations, a pattern of not being truthful and policy violations were found, and that Defendant Ingersoll resigned from the police department before the investigation was completed. PSAMF ¶ 326; DRPSAMF ¶ 326.

Officer Ingersoll knew Mr. Cote because he met him while in high school in Millinocket. JSSMF ¶ 34. Mr. Cote claims that Officer Ingersoll had a history of aggressive behavior directed at him, including police interactions reported to Chief Bolduc. JSSMF ¶ 35. Approximately three years prior to the events giving rise to this lawsuit, Officer Ingersoll was involved in a high speed chase where Mr. Cote was identified as the driver of the fleeing vehicle; the chase was terminated once Mr. Cote was identified. JSSMF ¶ 45. Mr. Cote instigated the high speed chase

---

[5]    Mr. Cote interposed qualified responses to paragraphs 96 and 97 on the ground that they are not supported by the cited reference or that the true facts are slightly different. PRDSMF ¶¶ 96-97. The Court rejects Mr. Cote's qualified responses because Mr. Cote stipulated to the contents of the paragraphs. JSSMF ¶¶ 96-97.

because he felt Officer Ingersoll was out of his jurisdiction.[6]  JSSMF ¶ 46. During the high speed chase, Mr. Cote stopped his vehicle to allow the five individuals in the car to leave. JSSMF ¶ 47.  Officer Ingersoll stopped his car and drew his service weapon at the five individuals exiting the vehicle.  JSSMF ¶ 48.  Mr. Cote then fled the scene and later turned himself in to the State Police and was subsequently arrested by the other members of the Millinocket Police Department, not including Officer Ingersoll, with the assistance of the Maine State Police. JSSMF ¶ 49.  Mr. Cote subsequently complained to Chief Bolduc about Officer Ingersoll's conduct during the high speed chase because Mr. Cote felt that Officer Ingersoll's drawing of his weapon when faced with a fleeing car that had stopped and from which five people were exiting was reckless. JSSMF ¶ 50.

Mr. Cote alleges that he complained to Chief Bolduc about Officer Ingersoll's conduct during a traffic stop relating to a cracked window and a loud exhaust on Mr. Cote's truck.[7]  JSSMF ¶ 51. More specifically, Mr. Cote complained to Chief Bolduc that Officer Ingersoll was out of line and was being rude and disrespectful

---

[6] The Stipulation reads:

> Mr. Cote instigated the high speed chase because he felt Officer Ingersoll was out of his jurisdiction.

*Stip.* ¶ 46; DSMF ¶ 46. Mr. Cote interposed qualified responses to paragraphs 46 and 47, contending that "Defendant's Statement of Fact distorts the testimony in the cited text of Mr. Cote, who disputes that there was a high speed chase." PRDSMF ¶¶ 46-47.  In view of the contradiction between the stipulation and the Plaintiff's version, the Court gives effect to the stipulation.

[7]     Mr. Cote interposed a qualified response to this paragraph, noting that he also complained that Officer Ingersoll was being out of line, rude and disrespectful during the stop.  PRDSMF ¶ 51.  The statement in Defendants' paragraph number 51 does not exclude the possibility that Mr. Cote made more specific complaints about Officer Ingersoll's conduct during the stop.  The Court has included not only the stipulated paragraph but also Mr. Cote's supplementary assertion.

during this traffic stop.[8]  PSAMF ¶ 325; DRPSAMF ¶ 325.  Mr. Cote felt that he was improperly ticketed by Officer Ingersoll because the crack in the windshield was not in his field of vision when operating his truck. JSSMF ¶ 52.

Officer Ingersoll has no medical training.   JSSMF ¶ 55. Officer Ingersoll knew that Mr. Cote was fearful of the Millinocket Police.  JSSMF ¶ 67.  Mr. Cote believes that Officer Ingersoll had a history of aggressive behavior directed at him that included police interactions involving Officer Ingersoll reported to Chief Bolduc.[9]  PSAMF ¶ 329; DRPSAMF ¶ 329.

Officer Ingersoll has previously grabbed, pushed and slapped various suspects.[10]   JSSMF ¶ 56.   On one prior occasion, Officer Ingersoll has struck a suspect who was refusing to submit to arrest and put his arms behind his back on the thigh with his baton. JSSMF ¶ 57. On one prior occasion, Officer Ingersoll deployed his Taser against a suspect who was using his vehicle as a battering ram and drove towards Officer Ingersoll, chasing him [Ingersoll] onto a porch. JSSMF ¶ 58.  During the incident when Officer Ingersoll used a Taser, no other officers were present.  JSSMF ¶ 59.  There was no use of force investigation into his prior use of a Taser.  JSSMF ¶ 60.

---

[8]     The Defendants objected to Plaintiff's paragraph 325 on the ground that it is duplicative of paragraph 51 and should be struck.  DRPSAMF ¶ 325.  The Court disagrees.  Plaintiff's paragraph 325 does not contradict Defendants' paragraph 51 and instead supplements the facts.  The Court has included it.

[9]     The Defendants denied Plaintiff's proposed paragraph 329 on the ground that it was phrased as a fact, not Mr. Cote's opinion.  DRPSAMF ¶ 329.  The Court agrees with the Defendants and rephrased the statement to reflect that it is Mr. Cote's belief, not an objective fact.

[10]     In his paragraph 327, Mr. Cote proposed that Officer Ingersoll "has used significant physical force an unknown number of times against suspects while employed as a Millinocket Police Officer." PSAMF ¶ 327.  The Defendants denied the assertion and maintained that the paragraph is not supported by the record reference.  DRPSAMF ¶ 327.  The Court reviewed the cited portion of Officer Ingersoll's deposition transcript and agrees with the Defendants that the transcript does not support the Plaintiff's assertion.  The Court has not included the paragraph.

Officer Ingersoll believed that in either 2007 or 2008 a citizen complained against him for alleged harassment, a complaint Chief Bolduc found to have been unfounded.[11]  JSSMF ¶ 64; PSAMF ¶ 336; DRPSAMF ¶ 336.  Officer Ingersoll believed that the Chief investigated the complaint but he is not sure.  JSSMF ¶ 65.  There was, however, no formal investigation of this citizen's complaint.  JSSMF ¶ 66.  No use of force investigations were ever conducted regarding Officer Ingersoll's admitted incidents of use of force beyond mere presence.  PSAMF ¶ 328; DRPSAMF ¶ 328.  Sergeant Cox testified that Officer Ingersoll may reach a higher anger level quicker than other officers.  JSSMF ¶ 68.

### 4.     Janet Theriault

On November 30, 2004, the town of Millinocket hired Janet Theriault as a reserve police officer and she was working in that capacity on October 31, 2008, the day of Mr. Cote's arrest.  JSSMF ¶ 74.  Officer Theriault has known Mr. Cote since he was a young child.   JSSMF ¶ 70. Officer Theriault grew up in the same neighborhood as Mr. Cote and, as a result, she had numerous casual but uneventful interactions with him during her lifetime.  JSSMF ¶ 71.  Officer Theriault did not have any contact with Mr. Cote in her position as a police office before the events giving rise to this lawsuit.  JSSMF ¶ 72.

Janet Theriault has an Associate Degree in Criminal Justice from the University of Maine at Presque Isle, a Certificate in Community Policing from the

---

[11]     The Defendants objected to this paragraph and urged that it be struck because it is duplicative of the Stipulation.  DRPSAMF ¶ 336.  The Court agrees that Plaintiff's paragraph 336 duplicates Stipulation paragraph 64 but sees no harm in citing Plaintiff's reiteration of his agreement with the contents of the paragraph.

University of Maine at Augusta, and she attended the Maine Criminal Justice Academy's 100 hour pre-service training program in approximately 2002 for certification as a reserve police officer. JSSMF ¶ 73. During her tenure with the Millinocket Police Department, no complaints have been filed against Officer Theriault. JSSMF ¶ 75. Officer Theriault believes that there have been complaints against other officers since she has worked for the Millinocket Police Department. JSSMF ¶ 76. Officer Theriault has used the force necessary to apply handcuffs between ten and fifty times during her employment as an officer for the town of Millinocket. JSSMF ¶ 77.

### 5.   Don Bolduc

Donald Bolduc is the Chief of Police for the Town of Millinocket. JSSMF ¶ 78. Chief Bolduc had interacted with Mr. Cote previously. JSSMF ¶ 87. Before October 31, 2008, Mr. Cote had a number of negative interactions with Defendant Bolduc.[12] JSSMF ¶ 89; PSAMF ¶ 322; DRPSAMF ¶ 322. First, he interacted with Mr. Cote after a high speed chase in which Mr. Cote had been identified as the driver of the fleeing vehicle. JSSMF ¶ 88. Mr. Cote had reported the incident to Chief Bolduc as involving a high speed chase and, when Mr. Cote stopped to let his passengers out, Officer Ingersoll had pulled a gun on the vehicle occupants, who were screaming and ducking, and then pointed a gun at Mr. Cote and was running

---

[12]     The Defendants interposed a qualified response, noting that the record citation by the Plaintiff "establishes only that Mr. Cote had some negative interactions, as opposed to 'a number' of negative interactions with Chief Bolduc. DRPSAMF ¶ 322. They also say that this paragraph is duplicative of their paragraph 89. DRPSAMF ¶ 322. Viewing the evidence in a light most favorable to Mr. Cote, the Court concludes that "some" refers to "a number." The Court agrees that Defendants' paragraph 89 is substantially the same as Plaintiff's paragraph 322 but sees no harm in documenting Mr. Cote's affirmation of the contents of both paragraphs.

with the gun drawn; Mr. Cote reported that he fled and later turned himself in to the police. PSAMF ¶ 324; DRPSAMF ¶ 324. Second, the Chief was involved in an incident in which Mr. Cote had committed a hit and run. JSSMF ¶ 89.

Chief Bolduc attended University College in Bangor and obtained a two-year Law Enforcement Degree. JSSMF ¶ 80. Chief Bolduc began employment with the Millinocket Police Department in 1989 as a reserve dispatcher and reserve officer. JSSMF ¶ 81. In 1990, he graduated from the Maine Criminal Justice Academy's 100 hour Part-time Reserve Law Enforcement Officer Training Course. JSSMF ¶ 82. Chief Bolduc began employment as a full-time officer with the Millinocket Police Department in August 1991. JSSMF ¶ 83. In 1992, he attended a twelve-week Maine Criminal Justice Academy Law Enforcement Course and received certification as a full-time police officer. JSSMF ¶ 84. Eight and a half years after starting full-time with the Millinocket Police Department, he was promoted to Sergeant. JSSMF ¶ 85. Chief Bolduc has been employed as the Chief of Police for Millinocket since 2004. JSSMF ¶ 86.

As Chief of Police, Chief Bolduc is a department head with the Town of Millinocket municipal government and responsible for policies and procedures within the Police Department. JSSMF ¶ 79. Apart from verbal complaints against Officer Ingersoll, Chief Bolduc received no other complaints during his tenure as Chief alleging the use of excessive force or arrest without probable cause by any of the officers involved with Mr. Cote. JSSMF ¶ 90. On one occasion, Officer Cox received a written reprimand for failing to follow police procedures during an arrest

by failing to identify bail conditions on a suspect that was his nephew.  JSSMF ¶ 26.

Other than Sergeant Cox, none of the other officers involved in Mr. Cote's case had

been disciplined during Chief Bolduc's tenure for violating police procedures

involving the use of force, the use of electronic control weapons or arrest.  JSSMF ¶

91.  During his tenure as Police Chief and prior to October 21, 2008,[13] Chief Bolduc

had no information that Sergeant Cox, Officer Ingersoll or Officer Theriault were

engaged in conduct that would lead him to believe they were engaged in making

arrests without probable cause or using force in making arrests that was excessive

or in violation of Millinocket Police Department policy.  JSSMF ¶ 92.  With the

exception of Mr. Cote's lawsuit, no lawsuits alleging excessive force have been filed

against the town of Millinocket or the officers named in this lawsuit during Chief

Bolduc's tenure as Chief.  JSSMF ¶ 93.

There was, however, a *pro se* lawsuit filed against the Millinocket Police

Department in 2004 involving an event in 2000 that Chief Bolduc was aware of and

monitored.  JSSMF ¶ 94. The *pro se* law suit was dismissed without any findings

against the Millinocket Police Department in 2009, after Mr. Cote's arrest.  JSSMF

¶ 95.

### 6.    Town of Millinocket

The town of Millinocket is a municipality in Penobscot County, Maine that

has a Police Department with a Chief of Police and various subordinate officers and

full-time and part-time reserve officers. JSSMF ¶ 98.  On December 12, 2006, the

---

[13]    The Court is unclear why the Stipulation refers to October 21—as opposed to October 31—
but accepts the statement as drafted.

Millinocket Police Department adopted an updated Use of Force Policy 2-1, which superseded prior versions.  JSSMF ¶ 99.  On June 15, 2008, the Police Department revised the Use of Force Policy 2-1.  JSSMF ¶ 100.  On September 21, 2007, the Department adopted a new Electronic Control Weapons (ECW) policy and revised this policy on May 30, 2008, effective June 15, 2008.  JSSMF ¶ 102.  The Millinocket ECW policy provides:

> [A]ll policies mandated by statute herein meet the standards as prescribed by the Board of Trustees of the Maine Criminal Justice Academy.

JSSMF ¶ 103.  Section 1 of the Use of Force policy states in part:

> Law enforcement officers are confronted daily with situations requiring the use of force to effect an arrest or ensure public safety. The degree of force used depends on what the law enforcement officer perceives as reasonable and necessary under the circumstances at the time they decided to use force.  Except for deadly force the application of any degree of force is only justified when the law enforcement officer reasonably believes that it is necessary:
>
> To prevent the escape from custody, make an arrest or an investigation detention of a person the law enforcement officer believes has committed a crime.

JSSMF ¶ 104.  Section 1 of the ECW policy states in part:

> It is the policy of this agency that an officer may use Electronic Control Weapons (ECW), as a situational use of force option, when and to the extent that the officer reasonably and actually believes it necessary to effect an arrest or to prevent the escape from custody of an arrested person.

JSSMF ¶ 105.  Section III of the ECW Policy states in part:

> Electronic control weapons are to be used to lower the risk of suspect and officer injury when the use of physical force is legally justified.

ECW's reduce the need for hands-on physical force to effect an arrest. ECW's, when used properly, have the ability to reduce officer and suspect injury and reduce exposure to liability.

JSSMF ¶ 106.  Sections V, C(1) and C(7) of the ECW policy state:

Deployment of Electronic Control Weapons: The decision to use the ECW involves the same justification in the situational use of force options as used in the deployment of chemical or pepper agents.

Officers shall not use the ECW: On individuals operating a motor vehicle, except where exigent circumstances are present.

JSSMF ¶ 107.  The Millinocket Police Department ECW policy requires that officers must be properly trained before being issued or using an ECW.  JSSMF ¶ 108.

Under Section VIII of the town of Millinocket Use of Force General Order dated December 18, 2006 and revised June 15, 2008, all serious applications of force shall be subject to two types of internal investigation.  JSSMF ¶ 112.  The Policy defines "serious applications of force" to begin usually with compliance techniques and to include more severe methods.  JSSMF ¶ 113.  Under the town of Millinocket Use of Force General Order, the first investigation is an administrative investigation conducted to determine whether agency standards were followed and the second investigation is a criminal review to detect law breaking.[14]  JSSMF ¶ 114; PSAMF ¶ 333; DRPSAMF ¶ 333.  Under the Millinocket Use of Force Order, all reported uses of force will be reviewed by the Chief of Police to determine whether agency orders were violated, whether relevant agency policy was clearly

---

[14]     The Defendants objected to Plaintiff's paragraph 333 on the ground that it repeats verbatim the contents of paragraph 114 of the Stipulation.  DRPSAMF ¶ 333.  Although the Defendants are correct, the Court sees no harm in allowing the Plaintiff to reiterate his acquiescence.

understandable and effective to cover the situation, and whether the training was adequate.[15]   JSSMF ¶ 115; PSAMF ¶ 335.

### 7.    Implementation of Policy

As of October 31, 2008, the Millinocket Police Department had in effect a policy concerning complaints against police officers.    JSSMF ¶ 116.    The Department adopted this policy from the recommendations of the Maine Criminal Justice Academy.   JSSMF ¶ 117. In the last seven years, Chief Bolduc individually reviewed each and every use of force report and incident report filed by Millinocket Police officers and determined whether to investigate the officers' use of force.[16] JSSMF ¶ 119; PSAMF ¶ 332; DRPSAMF ¶ 332.   Chief Bolduc has never filed a use of force report to any state agency under the town of Millinocket Use of Force Order dated December 12, 2006, revised June 15, 2008.[17]   JSSMF ¶ 121; PSAMF ¶ 330; DRPSAMF ¶ 330.   Chief Bolduc has never reported an incident of excessive force on the annual mandatory Excessive Force Report to the Maine Criminal Justice Academy.[18]   JSSMF ¶ 123; PSAMF ¶ 331; DRPSAMF ¶ 331.   Chief Bolduc has never convened a board of inquiry on any use of force incident perpetrated by a

[15]    The Defendants objected to Plaintiff's paragraph 335 on the ground that it recites the contents of paragraph 114 (actually paragraph 115) of the Stipulation.  DRPSAMF ¶ 335.  Although the Defendants are correct, the Court sees no harm in allowing the Plaintiff to reiterate his acquiescence.

[16]    The Stipulation stated that Chief Bolduc had individually reviewed each use of force report.  JSSMF ¶ 119.  The Plaintiff's paragraph 332 added "and incident report" to the use of force reports.  PSAMF ¶ 332.  The Defendants objected on the ground that Plaintiff's paragraph 332 is a verbatim recitation of Stipulation 119.  DRPSAMF ¶ 332.   The Court overrules the objection because— contrary to the Defendants' objection—the two paragraphs are not identical.

[17]    The Defendants objected to Plaintiff's paragraph 330 on the ground that it duplicates paragraph 121 in the Stipulation.  DRPSAMF ¶ 330.  Although the Defendants are correct, the Court sees no harm in allowing the Plaintiff to reiterate his acquiescence.

[18]    The Defendants objected to Plaintiff's paragraph 331 on the ground that it duplicates paragraphs 262 and 270 in the Stipulation.  DRPSAMF ¶ 331.  Although the Defendants are correct, the Court sees no harm in allowing the Plaintiff to reiterate his acquiescence.

Millinocket Police Officer. JSSMF ¶ 120. Chief Bolduc testified that all written and verbal complaints that were followed up and became written complaints (other than anonymous complaints) would be reported to the Maine Criminal Justice Academy Annual Report on Excessive Force Complaints. JSSMF ¶ 122; PSAMF ¶ 337; DRPSAMF ¶ 337. The Maine Criminal Justice Academy Annual Report on Excessive Force contains no reference to any filed complaints of excessive force for the town of Millinocket for the years 1999 through 2009.[19] JSSMF ¶ 124; PSAMF ¶ 339; DRPSAMF ¶ 339. From 1999 to 2010, there were no complaints of excessive forced lodged against the Millinocket Police Department pursuant to its Complaints Against Law Enforcement Agency Personnel Policy.[20] JSSMF ¶ 118.

Other than use of force reports that he prepared, Officer Ingersoll has never seen a use of force report generated by the Millinocket Police Department. JSSMF ¶ 61. Officer Ingersoll is not aware of any officer being disciplined as a result of use of force similar to force that he (Officer Ingersoll) describes. JSSMF ¶ 62. Officer Ingersoll has seen no use of force investigations or inquiries through the Millinocket Police Department and is not aware of a single officer being disciplined as a result of his or her use of force against a suspect or arrestee. JSSMF ¶ 63. The Defendants considered physical presence alone to be a type of force. JSSMF ¶ 101.

### 8. The Events of October 31st, 2008

[19]    The Defendants objected to Plaintiff's paragraph 339 on the ground that it duplicates paragraph 124 in the Stipulation. DRPSAMF ¶ 339. Although the Defendants are correct, the Court sees no harm in allowing the Plaintiff to reiterate his acquiescence.

[20]    Mr. Cote included the phrase, "as required", at the end of this sentence. PSAMF ¶ 338. The Defendants interposed a qualified response, indicating that the record citation did not confirm that reports were required. DRPSAMF ¶ 338. The Court reviewed the record citation and the Court agrees with the Defendants and has recited the contents of the Stipulation, not the Plaintiff's additional phrase because the additional phrase is not supported by the record.

### a.   Initial Domestic Dispute

Ninety Rhode Island Avenue (90 Rhode Island Avenue) in the town of Millinocket is "unit one" in a single building housing five rental units; the building housing 90 Rhode Island Avenue sits on a triangular piece of property bounded by Cottage Road, Michigan Avenue and Rhode Island Avenue.   JSSMF ¶ 125.   The three apartments accessed on the Cottage Road side of the building have Cottage Road addresses; the remaining two units have Rhode Island Avenue addresses. JSSMF ¶ 126.   The property is owned by Ralph Bragdon.   JSSMF ¶ 127.   Each apartment of the Bragdon apartment building has a discrete entrance and address. JSSMF ¶ 128.

Mr. Bragdon had rented "unit one", 90 Rhode Island Avenue, to Karen Woodbury and she had occupied the unit for slightly over one year.   JSSMF ¶ 129. Ms. Woodbury and Mr. Cote had been in a relationship on and off since 2003 and had been living together at 90 Rhode Island Avenue for several months.   JSSMF ¶ 130.   Before October 31, 2008, Wayne Cote had given money to Karen Woodbury to give to Mr. Bragdon to pay her rent.   JSSMF ¶ 131.

In the morning hours of October 31, 2008, Chief Bolduc and Detective Roland McCarthy responded to a call at 90 Rhode Island Avenue.   JSSMF ¶ 132. Mr. Cote and Ms. Woodbury were arguing about approximately $1,000 in charges on a cellphone bill incurred by Ms. Woodbury and her adult daughter, Christina Woodbury, who also resided at 90 Rhode Island Avenue.   JSSMF ¶ 133.   Christina Woodbury called the Millinocket Police to report the argument.   JSSMF ¶ 134.

Chief Bolduc received a report of a verbal domestic disturbance and a request to remove someone from the premises. JSSMF ¶ 135. Chief Bolduc and Detective McCarthy arrived at 90 Rhode Island Avenue at 9:02:33 a.m. JSSMF ¶ 136. Upon arrival, Chief Bolduc and Detective McCarthy could hear an argument inside 90 Rhode Island Avenue. JSSMF ¶ 137. Upon his arrival, Chief Bolduc observed things being thrown out of an upstairs window at 90 Rhode Island Avenue. JSSMF ¶ 138. As he walked up a stairway to the second floor, Chief Bolduc witnessed Mr. Cote and Ms. Woodbury arguing and Mr. Cote pulling his mattress down the stairs. JSSMF ¶ 139.

Upon meeting Mr. Cote on October 31, 2008, Chief Bolduc asked him to accompany him outside to speak; Detective McCarthy remained inside to talk with Ms. Woodbury. JSSMF ¶ 140. After an extensive conversation with Mr. Cote, Chief Bolduc informed him that he would have to leave, that he was not to return, that he would be allowed to return to collect his belongings with a police escort, and that he was to bring help if he needed assistance to load mattresses and furniture. JSSMF ¶ 141. Chief Bolduc specifically told Mr. Cote that he could return to the residence at 4 p.m. to pick up his things with an officer present. JSSMF ¶ 142; PSAMF ¶ 320.

Chief Bolduc knew that Officer Ingersoll was scheduled to begin his shift at 4:00 p.m. later that day. JSSMF ¶ 143. Mr. Cote was warned for criminal trespass at 9:16 a.m. and again just before he left at about 10:43 a.m. JSSMF ¶ 144. Mr. Cote was again advised that he could come back to the house at 4:00 p.m. that evening and get his belongings, but he would be arrested if he came back to the

apartment building or the area before then.   JSSMF ¶ 145; PSAMF ¶ 320; DRPSAMF ¶ 320.  During Defendant Bolduc's interaction with Mr. Cote during the wanted-out call he responded to, Defendant Bolduc issued a verbal criminal trespass warning not to return to 90 Rhode Island Avenue or the area, but did not notify Mr. Cote that any criminal trespass warning extended to Michigan Avenue, Rhode Island Avenue, or Cottage Road.  PSAMF ¶ 323; DRPSAMF ¶ 323.  Chief Bolduc believed that the "area" of 90 Rhode Island Avenue extends to Rhode Island Avenue, Michigan Avenue, and Cottage Road.[21]  PSAMF ¶ 321; DRPSAMF ¶ 321.

Mr. Cote was not allowed to go back into the apartment to collect his personal belongings before Chief Bolduc and Detective McCarthy cleared the scene.  JSSMF ¶ 146.  Chief Bolduc did not leave the premises until 10:43 a.m., an hour and 42 minutes after his arrival.  JSSMF ¶ 147.  Mr. Cote did not believe he had the right to stay in the apartment at 90 Rhode Island Avenue.  PSAMF ¶ 340; DRPSAMF ¶ 340.

Mr. Cote had called Ralph Bragdon, the owner of the building in which 90 Rhode Island Avenue is located and Ms. Woodbury's landlord, a day or two before October 31, 2008.  JSSMF ¶ 148.  Mr. Cote called Mr. Bragdon and Mr. Bragdon asked him to come to his house to pay rent and discuss the possibility of taking over the tenancy because Karen Woodbury was behind in the rent and had discussed moving out.  JSSMF ¶ 149.

---

[21]     The Defendants objected to Plaintiff's paragraph 321 on the ground that it duplicates paragraphs 262 and 270 in the Stipulation.  DRPSAMF ¶ 321.  The Court reviewed paragraphs 262 270 of the Stipulation and disagrees with the Defendants that Plaintiff's paragraph 321 is duplicative.  The Court overrules the Defendants' objection.

Mr. Cote later arrived at Mr. Bragdon's Millinocket Lake home a day or two before October 31, 2008.  JSSMF ¶ 150.  According to Mr. Bragdon, Mr. Cote said that he was Karen Woodbury's boyfriend and that he would like to pay her rent.  JSSMF ¶ 151.  Mr. Bragdon first learned that Mr. Cote had been living at the apartment when Mr. Cote arrived that day to pay the rent.  JSSMF ¶ 152.  Mr. Cote did not tell Mr. Bragdon about the morning's interactions with the police or that Ms. Woodbury had asked him to leave her apartment.  JSSMF ¶ 153.  Mr. Bragdon and Mr. Cote discussed Mr. Cote renting the apartment should Ms. Woodbury leave.  JSSMF ¶ 154.  Mr. Bragdon made it very clear to Mr. Cote that the apartment was Ms. Woodbury's until she gave notice of her intent to move, that she had not done so, and that Mr. Bragdon had not given her a notice to vacate.  JSSMF ¶ 155.  Mr. Bragdon provided Mr. Cote with a receipt for the payment of the November rent.  JSSMF ¶ 156.

### b.      Return to 90 Rhode Island Avenue

On October 31, 2008, Sergeant Cox began work at approximately 3:40 to 3:45 p.m. and Officers Ingersoll and Theriault began work at about 4:00 p.m. JSSMF ¶ 157.  Officer Theriault was working that evening because it was Halloween and they expected there would be extra activity; normally, the Millinocket Police Department schedules only two officers per shift.  JSSMF ¶ 158.  Sergeant Cox was the supervisor for the shift.  JSSMF ¶ 159.  Detective McCarthy briefed Sergeant Cox and Officers Ingersoll and Theriault on the morning's call to the Woodbury

residence and the conditions upon which Mr. Cote could collect his belongings. JSSMF ¶ 160.

A few minutes after starting his 4:00 p.m. shift, Officer Ingersoll received a telephone call from Mr. Cote asking if an officer was going to show up to assist him. JSSMF ¶ 161. Mr. Cote requested an officer so that he could pick up his things. JSSMF ¶ 162. At approximately 4:15 p.m., Officers Ingersoll and Theriault traveled together to 90 Rhode Island Avenue and Sergeant Cox decided to respond as well, arriving at the premises about two minutes after Officers Ingersoll and Theriault. JSSMF ¶ 163.

Officer Ingersoll's cruiser was equipped with a properly functioning camera. JSSMF ¶ 164. Sergeant Cox testified that it was standard practice and procedure to turn on the cruiser cameras. JSSMF ¶ 165. Officer Theriault did not know whether the cruiser camera was properly functioning. JSSMF ¶ 166. Officers are responsible to ensure that their issued equipment is functioning properly. JSSMF ¶ 167. The cruiser camera in Officer Ingersoll's cruiser produced no footage of the stop, arrest, or tasing of Mr. Cote on October 31, 2008 in violation of Millinocket Police Department practice and procedure. JSSMF ¶ 168.

When Officers Ingersoll and Theriault arrived on scene, Mr. Cote was sitting in his truck parked across from 90 Rhode Island Avenue. JSSMF ¶ 169. Officers Ingersoll and Theriault left the police cruiser and approached his vehicle. JSSMF ¶ 170. Prior to the arrival of Sergeant Cox, Mr. Cote asked Officers Ingersoll and Theriault if he could enter 90 Rhode Island Avenue to collect his belongings, and

was told by Officer Ingersoll that he was not allowed into the apartment to retrieve anything.[22]   JSSMF ¶ 171; PSAMF ¶ 342; DRPSAMF ¶ 342.   Officer Ingersoll instructed Mr. Cote to remove his belonging from the property and at some point threatened him with arrest.[23]   PSAMF ¶ 343; DRPSAMF ¶ 343.   Officer Ingersoll testified:  "I told Mr. Cote we were there and his stuff was in the driveway.  Go ahead and pick up your stuff."  JSSMF ¶ 172.  Mr. Cote responded that the items in the driveway were trash, were not his belongings, that this is not what he needed from the apartment, and that Chief Bolduc had told him earlier that day that he could return to the apartment and pick up his belongings.[24]  JSSMF ¶ 173; PSAMF ¶ 341; DRPSAMF ¶ 341.   Officer Ingersoll instructed Mr. Cote to remove his belongings and told him that if he did not comply with his instructions, he would be arrested for criminal trespass.  JSSMF ¶ 174.

Sergeant Cox arrived at 90 Rhode Island Avenue a couple of minutes after Officers Ingersoll and Theriault.  JSSMF ¶ 175.  When Sergeant Cox arrived, Mr. Cote's truck was in the road in front of the apartment house and Officers Ingersoll and Theriault were standing in the road speaking to Mr. Cote through his open truck window.  JSSMF ¶ 176.  Upon arrival, Sergeant Cox positioned his cruiser on

---

[22]     The Defendants objected to Plaintiff's paragraph 342 on the ground that is duplicative of paragraph 171 of the Stipulation.  DRPSAMF ¶ 342.  Although the Defendants are correct, the Court sees no harm in allowing the Plaintiff to reiterate his acquiescence.

[23]     Mr. Cote's original paragraph 343 asserted that after Officer Ingersoll instructed Mr. Cote to remove his belongings, he threatened him with arrest upon initial contact between the Officers and Mr. Cote.  PSAMF ¶ 343.  The Defendants objected on the ground that the record citation does not support the assertion.  DRPSAMF ¶ 343.  The Court reviewed the record citation and agrees with the Defendants.  It has altered the paragraph to conform to Officer Theriault's deposition testimony.

[24]     The Defendants objected to Plaintiff's paragraph 341 on the ground that is duplicative of paragraph 173 of the Stipulation.  DRPSAMF ¶ 341.  Although the Defendants are correct, the Court sees no harm in allowing the Plaintiff to reiterate his acquiescence.

Rhode Island Avenue off the corner of Cottage Road, signed off, activated the in-cruiser camera and stepped out of his vehicle.   JSSMF ¶ 177.   As Sergeant Cox approached Mr. Cote, Mr. Cote and Officer Ingersoll were engaged in conversation; Officer Ingersoll informed Mr. Cote:  "Well, you've got about five minutes and then you are going to jail."  JSSMF ¶ 178.

Sergeant Cox approached Mr. Cote and informed him through the open window that this was his opportunity to collect his belongings.  JSSMF ¶ 179.  Mr. Cote told Sergeant Cox that he wanted him to contact the landlord.  JSSMF ¶ 180. Sergeant Cox replied that the substance of his request was a civil matter and it was not going to happen.  JSSMF ¶ 181.  Mr. Cote argued that it was not a civil matter and that someone was in the house who should not be there.  JSSMF ¶ 182.  Mr. Cote did not believe he had the right to stay in the apartment situated at 90 Rhode Island Avenue.  PSAMF ¶ 340; DRPSAMP ¶ 340.  Sergeant Cox reiterated that this was an opportunity for Mr. Cote to collect his belongings and that it was, in fact, what the police officers wanted him to do.  JSSMF ¶ 183.  After repeatedly telling the officers that the property in the driveway was not his, Mr. Cote drove away. JSSMF ¶ 184.

Approximately two minutes later, Mr. Cote returned to the premises and parked in the driveway.  JSSMF ¶ 185.  As Officers Ingersoll and Theriault approached his vehicle, Mr. Cote, who was having transmission problems with his truck, either attempted to place the vehicle in park or back up.  JSSMF ¶ 186. Sergeant Cox approached Mr. Cote's vehicle and told him that he must either get

his belongings and leave or face arrest.  JSSMF ¶ 187.  Mr. Cote responded through a closed window that he did not want the items as they were not his.  JSSMF ¶ 188. After Mr. Cote's response, Sergeant Cox told Mr. Cote twice to leave or he would be arrested for criminal trespass.  JSSMF ¶ 189.   Sergeant Cox refused to argue the matter with Mr. Cote, and once again informed him that he had to leave or be arrested.  JSSMF ¶ 190.  Mr. Cote responded that he was not afraid of being arrested and he had been arrested "30 fucking times."  JSSMF ¶ 191.  Officer Ingersoll remarked, "good," and Sergeant Cox told him that there would be "one more" added to it, namely another arrest.  JSSMF ¶ 192.  The Officers repeatedly told Mr. Cote to leave.  JSSMF ¶ 193.  Mr. Cote responded to the Officers' instructions by telling them to "fucking shut up and get out of my face" and saying "you go."  JSSMF ¶ 194.

During their last conversation with Mr. Cote in 90 Rhode Island Avenue, which took place about five minutes after Sergeant Cox turned on the cruiser videotape, Sergeant Cox told Mr. Cote: "Don't come back.  Come back and you're going to get arrested."  JSSMF ¶ 195.  While in the driveway directly in front of 90 Rhode Island Avenue, Sergeant Cox only told Mr. Cote, "Don't come back; you come back, you're going to get arrested;" he did not warn him to stay away from Michigan Avenue, Rhode Island Avenue, or Cottage Road.  PSAMF ¶ 318; DRPSAMF ¶ 318.

During his conversation with Mr. Cote, Officer Ingersoll warned Mr. Cote that if he did not leave, he would be arrested for criminal trespass.  JSSMF ¶ 196. After about five minutes, Mr. Cote once again left the 90 Rhode Island Avenue

property as instructed.  JSSMF ¶ 196.  At no time that day after the final warning to leave did Mr. Cote return to 90 Rhode Island Avenue and following his departure, Mr. Cote remained on public roadways.  JSSMF ¶ 197.

Officer Ingersoll radioed dispatch and reported that Mr. Cote had been warned for criminal trespass at the location of 90 Rhode Island Avenue.[25]  JSSMF ¶ 198.  Approximately two minutes later, Mr. Cote returned to the vicinity of 90 Rhode Island Avenue and drove down an adjacent street.  JSSMF ¶ 199.  Mr. Cote had several relatives living in a two block radius of the Bragdon apartment building and was attempting to drive around and find a relative to assist him in retrieving his belongings from 90 Rhode Island Avenue.  JSSMF ¶ 200; PSAMF ¶¶ 344-45; DRPSAMF ¶¶ 344-45.[26]

After Mr. Cote left, Officer Ingersoll commented that if they had a chance to stop him, they would "go hands-on" and "put the knuckles to him."  JSSMF ¶ 201.  In response to Officer Ingersoll's comment, Officer Theriault laughed.[27]  JSSMF ¶ 202.  After Officer Ingersoll's comment, Sergeant Cox did not immediately respond; however, within about three seconds, Sergeant Cox said: "No, I don't want to give

---

[25]    Mr. Cote qualified his response, asserting that Officer Ingersoll radioed dispatch and reported that he had been warned for criminal trespass at the location of 90 Rhode Island Avenue.  PRDSMF ¶ 198.  The Court reviewed the videotape and confirms that Officer Ingersoll did inform dispatch that Mr. Cote had been warned for criminal trespass at 90 Rhode Island Avenue and the Court has therefore added this phrase to Stipulation paragraph 198.

[26]    The Defendants objected to Plaintiff's paragraph 345 on the ground that is duplicative of paragraph 200 of the Stipulation.  DRPSAMF ¶ 345.  Although the Defendants are correct, the Court sees no harm in allowing the Plaintiff to reiterate his acquiescence.

[27]    In his paragraph 350, the Plaintiff asserted that the Defendants spoke in "derogatory terms" about him and then decided to pull him over, bust out his window, go hands on with him, tase him, and put the knuckles to him while Officer Theriault laughed at their comments.  PSAMF ¶ 350.  The Defendants denied this paragraph.  DRPSAMF ¶ 350.  The parties stipulated to all of these facts, but with the caveat that they reflect Mr. Cote's perspective.  JSSMF ¶ 257.  The Court amended the Plaintiff's paragraph 350 to reflect that the assertion is from Mr. Cote's perspective.  *See* PSAMF ¶ 350 below.

him a chance to take off so I would rather (inaudible)." JSSMF ¶ 203.  After Officer Ingersoll replied, Sergeant Cox said further, "I would rather have him hit a tree or hit a car rather than I would give him a chance to get out here and hit a kid." JSSMF ¶ 203.  The Officers discussed the potential of using a Taser against Mr. Cote but the conversation assumed that he would not cooperate.  JSSMF ¶ 204. The Officers' statements were not a plan to deploy a Taser against Mr. Cote, rather a prediction as to how the events would unfold.[28]  JSSMF ¶ 205.

Sergeant Cox received a request from the dispatcher to call Chief Bolduc and Sergeant Cox spoke with Chief Bolduc by cellphone, advising the Chief of the events that had taken place with Mr. Cote.  JSSMF ¶ 206.  Sergeant Cox advised Chief Bolduc that things were not proceeding according to plan at 90 Rhode Island Avenue, which had anticipated that Mr. Cote would take his belongings and leave. JSSMF ¶ 207.  Sergeant Cox reported to Chief Bolduc that Mr. Cote was faking a cellphone call to Ralph Bragdon.  JSSMF ¶ 208.  Sergeant Cox advised Chief Bolduc that Mr. Cote had left the area momentarily, would not take his belongings, and that he thought Mr. Cote would return.  JSSMF ¶ 209.  Sergeant Cox advised Chief Bolduc that it appeared Mr. Cote was circling the block, waiting for the Officers to leave.  JSSMF ¶ 210.  Sergeant Cox advised Chief Bolduc that he was concerned about the threat Mr. Cote posed to the public in this residential neighborhood on

---

[28]      In his paragraph 349, Mr. Cote asserts that Sergeant Cox "discussed a premeditated plan of action against Mr. Cote with Defendants Ingersoll and Theriault, which was acted against Mr. Cote with co-Defendants Ingersoll and Theriault within minutes of the conversation."  PSAMF ¶ 349. The Defendants denied this paragraph on the ground that the Plaintiff admitted that the Officers' statements were not a plan but a prediction as to how the events would unfold.  DRPSAMF ¶ 349. The Court cannot reconcile Plaintiff's paragraph 349 with Stipulations 204 and 205, and in the face of a conflict between the Stipulation of the parties and the statements of fact, the Court gives effect to the Stipulation.  The Court has not included Plaintiff's paragraph 349.

what was anticipated to be a busy evening of pedestrian traffic since it was Halloween night.   JSSMF ¶ 211.   Sergeant Cox advised Chief Bolduc that he expected Mr. Cote to attempt to elude the officers and public safety concerns would not permit that.   JSSMF ¶ 212.   Sergeant Cox also advised the Chief that the situation might come to the point where the officers would need to make a physical arrest of Mr. Cote by breaking a window in his truck and using a Taser to remove him and place him in custody.   JSSMF ¶ 213.   During the event while Mr. Cote was driving on the streets around 90 Rhode Island Avenue, Sergeant Cox stated:   "He's just circling around and around; nothing says he can't do that."   JSSMF ¶ 214.

Sometime after Mr. Cote's second departure from 90 Rhode Island Avenue, Officer Ingersoll received a report from a tenant of the building that Mr. Cote had returned to the building and he did not want him there.   JSSMF ¶ 215.   Specifically, the tenant, Mr. Wolfe, informed Officer Ingersoll that Mr. Cote had stopped in front of his apartment unit located in the same building as 90 Rhode Island Avenue on the Cottage Road side of the Bragdon building.   JSSMF ¶ 216.   Mr. Cote had spoken with Eugene Wolfe at his Cottage Road apartment in the morning, and got a coat hanger and things to get Mr. Cote's truck unlocked.   PSAMF ¶ 346; DRPSAMF ¶ 346.   Mr. Cote does not recall seeing Eugene Wolfe in the afternoon and did not talk to him in the afternoon before Mr. Cote was arrested.[29]   PSAMF ¶ 347;

---

[29]   The Defendants denied this statement, contending that Mr. Cote testified that he "might have spoken with Eugene Wolf[e] that [sic] on the afternoon of his arrest."  DRPSAMF ¶ 324.
    The relevant portion of Mr. Cote's transcript reads:

    Q.  Did you talk with Eugene Wolfe in the afternoon?
    A.  No, I don't think I did.  No. I didn't.

DRPSAMF ¶347.  Officer Theriault did not actually see Mr. Cote pull up in front of the Cottage Road entrance of Mr. Wolfe, but was later told at some point that, during the time period she was standing there, one of the tenants had expressed that to another Officer.  PSAMF ¶ 348; DRPSAMF ¶ 348.

### c.   Initial Stop

About three and one-half minutes after his second departure from 90 Rhode Island Avenue, Mr. Cote again drove by 90 Rhode Island Avenue by proceeding on Michigan Street and turning left at the intersection of Michigan Street and Rhode Island Avenue.  JSSMF ¶ 217.  Sergeant Cox reported in his incident report that he noticed Officers Ingersoll and Theriault making for their cruiser; Sergeant Cox exited his cruiser and Officer Ingersoll advised that Wayne Cote had been circling the apartment around and around and "it was enough"; they took off to stop Mr. Cote.  PSAMF ¶ 319; DRPSAMF ¶ 319.

Officers Ingersoll and Theriault pursued Mr. Cote's vehicle.  JSSMF ¶ 218. Officer Theriault testified that just before she and Officer Ingersoll pursued Mr. Cote, she noticed Mr. Cote pass by Rhode Island Avenue driving on Michigan Avenue and staring at the officers; at that point the officers got into the cruiser and stopped Mr. Cote. PSAMF ¶ 311; DRPSAMF ¶ 311.  Officer Theriault testified that Mr. Cote's actions—driving by and looking in the direction of the officers—were not criminal offenses. PSAMF ¶ 312; DRPSAMF ¶ 312.  Officer Theriault testified that

---

PSAMF Attach. 6 *Dep. of Wayne Cote* 44:22-23 (May 12, 2011).  It is apparent that Mr. Cote first testified that he did not think he had spoken to Mr. Wolfe and then clarified that he denied speaking with him.  The Defendants' denial is frivolous and the Court refuses to accept it.

she did not know the reason for stopping Mr. Cote as she was on-looking and did not have an active role. PSAMF ¶ 313; DRPSAMF ¶ 313.

Sergeant Cox followed in his cruiser. JSSMF ¶ 219. It was Officer Ingersoll's intention to arrest Mr. Cote for criminal trespass because, in his view, Mr. Cote had returned to "the area" or "the immediate area" of 90 Rhode Island Avenue after being warned not to do so. JSSMF ¶ 220. Officer Theriault testified that the meaning of "immediate area" is "a matter of opinion between individuals." JSSMF ¶ 221.

Officer Ingersoll activated his takedown lights and Mr. Cote pulled off to the side of the road at the intersection of Forest Avenue and Cottage Avenue. JSSMF ¶ 222. Sergeant Cox arrived at the scene of the stop as Officers Ingersoll and Theriault exited their cruiser. JSSMF ¶ 223. Sergeant Cox testified that Mr. Cote had committed a criminal trespass by returning to 90 Rhode Island Avenue. JSSMF ¶ 224.

After stopping Mr. Cote, Officer Ingersoll approached the driver's side of Mr. Cote's vehicle and gave multiple instructions: roll the window down, unlock the door, and if he would not roll the window down, Officer Ingersoll would break the window, and to step out. JSSMF ¶ 225; PSAMF ¶ 351; DRPSAMF ¶ 351.[30] At the same time, Sergeant Cox gave Mr. Cote overlapping instructions as Officer Ingersoll yelled commands and attempted to break Mr. Cote's window. JSSMF ¶ 226;

---

[30] The Defendants objected to Plaintiff's paragraph 351 on the ground that it combined Stipulations 225 and 226 and the Plaintiff has already admitted those facts. DRPSAMF ¶ 351. Although the Defendants are correct, the Court sees no harm in allowing the Plaintiff to reiterate his acquiescence.

PSAMF ¶ 351; DRPSAMF ¶ 351.  Mr. Cote did not comply with Officer Ingersoll's commands.  JSSMF ¶ 227.  Officer Ingersoll and to a lesser extent Sergeant Cox repeatedly instructed Mr. Cote to unlock the door and get out of the truck.  JSSMF ¶ 228.  Mr. Cote did not comply with the Officers' commands and instead remained inside his locked truck, repeatedly asking "What did I do wrong?"  JSSMF ¶ 229.  As Officer Ingersoll attempted to break his window, Mr. Cote continued to ask why he was stopped.  JSSMF ¶ 230.  Officer Ingersoll did not recall at his deposition whether he explained to Mr. Cote the reason the Officer had stopped him; however, the videotape of the encounter reveals that Officer Ingersoll told Mr. Cote he had stopped him for criminal trespass.  JSSMF ¶ 231.  Mr. Cote did not understand why he was pulled over, a fact never adequately explained to him.  JSSMF ¶ 232.

Sergeant Cox, who was on the passenger's side window, notified Officer Ingersoll that the Cote truck's transmission was in "drive."  JSSMF ¶ 233.  Mr. Cote was having transmission problems with his truck and may have attempted to place the vehicle into park.  JSSMF ¶ 234.  Mr. Cote called emergency 911 and requested assistance.  PSAMF ¶ 353; DRPSAMF ¶ 353.  Sergeant Cox believed that Mr. Cote was faking a cellphone call during the stop, but Mr. Cote was in fact on the phone with E-911 dispatch.  JSSMF ¶ 235.   Mr. Cote was on the phone to E-911 when Ralph Bragdon, the owner of the apartment building at 90 Rhode Island Avenue, arrived at the scene of the stop; Mr. Cote began to honk his horn and yell for Ralph

Bragdon and continued to honk his horn for several seconds.[31]   JSSMF ¶ 236;
PSAMF ¶ 354; DRPSAMF ¶ 354.  At approximately 15:45:19, about the time Mr.
Cote was honking his horn, Sergeant Cox broke the passenger side window of Mr.
Cote's truck.  JSSMF ¶ 237.  Mr. Cote was on his cellphone to E-911 dispatch at the
time his window was broken.[32]   JSSMF ¶ 238; PSAMF ¶ 355; DRPSAMF ¶ 355.

During the three minutes before Sergeant Cox broke the window, the
following events had taken place: Officer Ingersoll and Sergeant Cox had repeatedly
demanded that Mr. Cote put his vehicle into park, unlock his doors, and exit the
vehicle; Mr. Cote repeatedly asked why he was stopped, and why he was being
arrested for criminal trespass when he had not returned to 90 Rhode Island
Avenue.   JSSMF ¶ 239.  Mr. Cote continued to ask why he was stopped, and was
anxious and confused by the stop itself and by the competing commands issues by
both officers.[33]   JSSMF ¶ 240; PSAMF ¶ 352; DRPSAMF ¶ 352.  Mr. Cote did not
comply with the Officers' orders; he says he did not do so because he did not
understand why he had been pulled over and the Officers never explained to him
why he was stopped.  JSSMF ¶ 241.

Other than contributing by her physical presence to the show of authority
from the police, Officer Theriault had no physical or verbal contact with Mr. Cote

---

[31]     The Defendants objected to Plaintiff's paragraph 354 on the ground that it is an "abbreviated version of DSMF ¶ 236." DRPSAMF ¶ 354. Although the Defendants are correct, the Court sees no harm in allowing the Plaintiff to reiterate his acquiescence.

[32]     The Defendants objected to Plaintiff's paragraph 355 on the ground that it is "almost a verbatim recitation of DSMF ¶ 238." DRPSAMF ¶ 355. Although the Defendants are correct, the Court sees no harm in allowing the Plaintiff to reiterate his acquiescence.

[33]     The Defendants objected to the Plaintiff's paragraph 352 on the ground that it is a verbatim recitation of Stipulation paragraph 240. DRPSAMF ¶ 352. Although the Defendants are correct, the Court sees no harm in allowing the Plaintiff to reiterate his acquiescence.

during the initial stop.  JSSMF ¶ 242.  At one point, Defendant Theriault handed Defendant Cox her baton.  PSAMF ¶ 315.  Although both Sergeant Cox and Officer Ingersoll were wielding collapsible batons, commonly referred to as an ASP, as they yelled at Mr. Cote, they did not draw their firearms or Tasers during this initial stop.  JSSMF ¶ 243.

### d.      Second Stop and Arrest

After Sergeant Cox broke the passenger window, Mr. Cote was startled and pulled away from the scene.  JSSMF ¶ 244; PSAMF ¶ 356; DRPSAMF ¶ 356.  Mr. Cote pulled away from the scene of this stop because he was startled by the window being smashed by Sergeant Cox, but he almost immediately pulled over again as he continued his conversation with E-911.[34]  PSAMF ¶ 356; DRPSAMF ¶ 356.  Mr. Cote pulled over a short distance away at the intersection of Cottage Avenue and Middle Street, stopped his truck, but kept his engine running; he was blocked in by Officer Ingersoll's cruiser in the front and Sergeant Cox's cruiser in the rear as he continued his conversation with E-911.  JSSMF ¶ 245; PSAMF ¶ 356.  After he was pulled over a second time, Mr. Cote made no attempts to flee or evade arrest by vehicle or on foot.  JSSMF ¶ 246.  Shortly before he was tased and arrested, Mr. Cote called Ralph Bragdon by cellphone and asked him to come to 90 Rhode Island Avenue.  JSSMF ¶ 247.

---

[34]     The Defendants objected to Plaintiff's paragraph 356 on the ground that it "simply combines DSMF ¶ 244 and ¶ 245."  DRPSAMF ¶ 356.  The difference between Plaintiff's paragraph 356 and Stipulations 244 and 245 is that Plaintiff's paragraph 356 explicitly states that Mr. Cote pulled away because he was startled.  The Court overrules the Defendants' objection and has included Plaintiff's paragraph 356.

At the second stop, Sergeant Cox went to the passenger side window with his Taser drawn and pointed it at Mr. Cote through the broken passenger side window. JSSMF ¶ 248. Sergeant Cox ordered Mr. Cote to open the door and Mr. Cote said, "no," and asserted that he was not criminally trespassing. JSSMF ¶ 249. Sergeant Cox warned Mr. Cote to open the door or he would be tased. JSSMF ¶ 250. Over the space of the next 45 to 55 seconds, Sergeant Cox ordered Mr. Cote to open the door at least seven times but Mr. Cote did not do so. JSSMF ¶ 251. During this time and at the time he was tased, Mr. Cote was still on the phone, requesting assistance from E-911 dispatch. JSSMF ¶ 251; PSAMF ¶ 357; DRPSAMF ¶ 357. Mr. Cote was reluctant to consent to the officers because of his confusion, their lack of explanation, and his negative prior interactions with the police in general and these officers specifically. JSSMF ¶ 252. Mr. Cote heard the officers and understood that they were serious about getting him out of his truck, but he was determined that he was not going to exit the vehicle. JSSMF ¶ 253.

Sergeant Cox did not make any attempt to open the vehicle door or to enter the truck in an attempt to arrest Mr. Cote because the car was still in drive. JSSMF ¶ 254. Sergeant Cox felt that it would be unsafe for him or another officer to get inside the vehicle until Mr. Cote was incapacitated. JSSMF ¶ 255. Sergeant Cox deployed the Taser against Mr. Cox. JSSMF ¶ 256. At one point, Officer Theriault handed Sergeant Cox her baton. PSAMF ¶ 315; DRPSAMF ¶ 315. Officer Theriault did not lodge any objections to the suggested use of force against Mr. Cote. PSAMF ¶ 316; DRPSAMF ¶ 316.

From Mr. Cote's perspective, Sergeant Cox deployed the Taser because less than ten minutes before he was stopped, Sergeant Cox and Officers Ingersoll and Theriault had spoken in derogatory terms about Mr. Cote, after which they decided to pull him over, bust out his window, "go hands on with him," tase him, and put the knuckles to him, all the while Officer Theriault laughed at their comments. JSSMF ¶ 257; PSAMF ¶ 350; DRPSAMF ¶ 350. At no time from the beginning of their initial exchange with Mr. Cote until he was stopped, tased and arrested, did Mr. Cote use physical force or threaten the use of physical force against any of the Defendants. JSSMF ¶ 258.

As a result of his being tased, Mr. Cote was screaming in pain and agony and his truck rolled forward striking one of the police cars. JSSMF ¶ 259. Officer Ingersoll extracted Mr. Cote from his truck after it came to a stop and placed him on the ground for handcuffing. JSSMF ¶ 260. Sergeant Cox and Officers Ingersoll and Theriault were holding Mr. Cote down after he had been tased. JSSMF ¶ 261. Officer Theriault actively participated in the arrest and handcuffing of Mr. Cote by holding down Mr. Cote's right arm.[35] JSSMF ¶ 262; PSAMF ¶ 314; DRPSAMF ¶ 314. At no time did Officer Theriault kneel on Mr. Cote's back. JSSMF ¶ 264. Officer Ingersoll kneeled on Mr. Cote's back as he was handcuffing him for approximately thirty seconds. JSSMF ¶ 263. Sergeant Cox informed Officer Ingersoll that he was wrapped in Taser wire. JSSMF ¶ 265. Officer Ingersoll instructed Sergeant Cox "don't pull the trigger" after he discovered that the Taser

---

[35] The Defendants objected to Plaintiff's paragraph 314 on the ground that it duplicates paragraphs 262 and 270 of the Stipulation. DRPSAMF ¶ 314. Although the Defendants are correct, the Court sees no harm in allowing the Plaintiff to reiterate his acquiescence.

wire was caught on his leg.  JSSMF ¶ 266.  Officer Ingersoll placed his knee on Mr. Cote's back while disengaging himself from the Taser leads.  JSSMF ¶ 267.  Officer Ingersoll took care and time to untangle himself from the Taser X26 wires in order to avoid potential exposure to himself and the other Officers.  JSSMF ¶ 268.

After Officer Ingersoll applied handcuffs to Mr. Cote, he lifted him by the handcuffs, shoulders or arms, told him to shut up, put him back on the ground, knelt on his back for approximately 15 seconds to disengage the Taser wires while Mr. Cote complained that his back was broken, assisted Mr. Cote up, forced him against the truck, and patted him down while he was against the truck[36].  JSSMF ¶ 269; PSAMF ¶ 358; DRPSAMF ¶ 358.  As Officer Ingersoll knelt on Mr. Cote's back and as the Taser effects diminished, Mr. Cote cried out to the Officers that his back was injured.[37]  PSAMF ¶ 359; DRPSAMF ¶ 359.  Officer Theriault held down Mr. Cote's right arm, assisted in pinning Mr. Cote against his vehicle after he was handcuffed, and assisted in frisking him.  JSSMF ¶ 270; PSAMF ¶ 314.  While against the truck, Mr. Cote complained that Officer Ingersoll was pulling him away from the truck.  JSSMF ¶ 271.

After being tased, Mr. Cote stated, "You mother fuckers are going to be sued."  *JSSMF ¶ 272.*  After being tased, Mr. Cote was verbally combative with the officers;

---

[36]    The Defendants interposed a qualified response, noting that the record citation by the Plaintiff only admits "that Officer Ingersoll picked Mr. Cote up by his handcuffs, shoulders or arms." DRPSAMF ¶ 358.  The Court reviewed the record citation and the Court agrees with the Defendants and has recited the contents of the Stipulation, not Plaintiff's additional phrase, "that Defendant Ingersoll lifted him up from the ground by his arms", because the additional phrase is not supported by the record. PSAMF ¶ 358.

[37]    The Defendants objected to Plaintiff's paragraph 359 on the ground that it duplicates paragraph 274 of the Stipulation.  DRPSAMF ¶ 359.  Although the Defendants are correct, the Court sees no harm in allowing the Plaintiff to reiterate his acquiescence.

he was in pain and agony and after he regained his faculties, he complained that Officer Ingersoll had injured his back by kneeling on it. JSSMF ¶273. Mr. Cote cried out to the officers that his back was injured as Officer Ingersoll knelt on it after the Taser effects diminished. JSSMF ¶ 274; PSAMF ¶ 359. Mr. Cote continued shouting that he had a bad back and stated that his back and neck were "broken." JSSMF ¶ 275. Mr. Cote was pulled away from the truck fender and shoved back into the truck no fewer than seven times. JSSMF ¶ 276. Mr. Cote complained to the officers about being pulled away from the fender of the truck. JSSMF ¶ 277. Mr. Cote continued to yell, swear at the Officers, and allege that he had back and neck problems as well as nerve and brain damage. JSSMF ¶ 278. Mr. Cote repeatedly requested the aid of a state trooper. JSSMF ¶ 279.

After he was tased and handcuffed, Mr. Cote was placed in the police cruiser. JSSMF ¶ 280. Mr. Cote began shaking uncontrollably. JSSMF ¶ 281. Officer Ingersoll told Mr. Cote to sit still, grabbed his neck, and forced his head between his legs. JSSMF ¶ 282. Chief Bolduc received a dispatch request to respond to the scene of Mr. Cote's arrest on October 31, 2008 and arrived at the arrest scene two to three minutes after the call. JSSMF ¶ 283. After Chief Bolduc arrived at the scene, Sergeant Cox briefed Chief Bolduc on the events that had taken place. JSSMF ¶ 284.

### e.     Post-Arrest Events

Sergeant Cox did not believe that Mr. Cote was having a seizure but requested an ambulance to the scene where he was arrested. JSSMF ¶ 285. Officer

Ingersoll was aware that other Officers noticed seizure symptoms at the scene. JSSMF ¶ 286. While Mr. Cote was handcuffed in the cruiser, Officer Ingersoll remarked to Chief Bolduc: "He is trying to pull the, he's been doing a seizure now for about five minutes." JSSMF ¶ 287. Officer Theriault testified that some Officers thought that Mr. Cote was acting out, rather than experiencing actual seizure symptoms, and that no Officer discussed seizures at the scene of Mr. Cote's arrest. JSSMF ¶ 288. Sergeant Cox testified that "had it not been probably for the seizure, he would have been transported by us to Millinocket Regional Hospital in our cruiser." JSSMF ¶ 289. Officer Theriault believed that the ambulance was called to transport Mr. Cote to the hospital for Taser probe removal. JSSMF ¶ 290.

Because Sergeant Cox requested an extra officer go to the Hospital, Officer Theriault drove a cruiser to Millinocket Regional Hospital after Mr. Cote was transported there by ambulance. JSSMF ¶ 291. Sergeant Cox accompanied Mr. Cote in the ambulance to Millinocket Regional Hospital. JSSMF ¶ 292.

Mr. Cote complained of back pain and headache upon arrival at Millinocket Regional Hospital. JSSMF ¶ 293. Neither Sergeant Cox nor Officer Theriault notified medical personnel that Mr. Cote had a seizure after being tased. JSSMF ¶ 294.

Joseph Aquilina is a nurse practitioner who worked in the Emergency Department at Millinocket Regional Hospital and who treated Mr. Cote on October 31, 2008. JSSMF ¶ 295. Mr. Aquilina stated that a triage nursing note detailed Mr. Cote's initial check-in when Pat Morin, R.N. performed an initial patient

assessment.   JSSMF ¶ 296.   The triage note contains a patient assessment demonstrating the need for care that is used to assist the treating physician with diagnosis and treatment of medical conditions.   JSSMF ¶ 297.   Nurse Morin took a history that Mr. Cote had been tased and arrested and complained of back pain and headache, but Mr. Cote did not report that he had suffered a seizure after being tased.   JSSMF ¶ 298.   Mr. Aquilina testified that the police officers did not inform him that Mr. Cote had a seizure after being tased and arrested.   JSSMF ¶ 299.

Officers Ingersoll and Theriault did not mention Mr. Cote's apparent seizures in their incident reports following his arrest.   JSSMF ¶ 300.   Defendant Theriault did not lodge any objections to the suggested use of force against Mr. Cote. PSAMF ¶ 316.

Sergeant Cox informed Officer Ingersoll that Mr. Cote had $155.00 in cash in his possession.   JSSMF ¶ 301.   Officer Ingersoll noted in his report that the bail commissioner was contacted and advised as to the nature of the arrest.   JSSMF ¶ 302. After speaking to the one of the Defendant Officers regarding Mr. Cote's arrest on misdemeanor charges, the bail commissioner set Mr. Cote's bail at $50,000 cash. JSSMF ¶ 303.   After Mr. Cote spent the weekend in jail, his bail was reduced and he made bail.   JSSMF ¶ 304.   After he was booked, Sergeant Cox and Officer Theriault transported Mr. Cote to the Penobscot County Jail in Patrolman's Car Number 2.   JSSMF ¶ 305.   Sergeant Cox did not activate the cruiser video camera when transporting Mr. Cote to Penobscot County Jail and did not videotape his transport to jail.   JSSMF ¶ 306.

### 9.     Town of Millinocket Insurance Coverage

Argonaut Insurance issued two liability policies to the town of Millinocket with effective dates of April 27, 2008 through April 27, 2009.  JSSMF ¶ 307.  They were a Law Enforcement Professional Liability Policy, MLE 7000045100 and a Commercial General Liability Policy, No. MGL 7000045100.  JSSMF ¶ 308.  Argonaut Insurance is providing for the town of Millinocket's defense in this case under those policies.   JSSMF ¶ 309.   The Liability Coverage for these policies contains the following limits of liability:

> $400,000 per occurrence, $1,000,000 General Aggregate Limit of Liability for causes of action seeking tort damages pursuant to the provisions of the Maine Tort Claims Act (14 M.R.S.A. § 101 et seq.).

> Coverage is limited to those areas for which governmental immunity has been expressly waived by 14 M.R.S.A. § 8104-A, as limited by 14 M.R.S.A. § 8104-B, and 14 M.R.S.A. § 8111.  Coverage amounts for causes of action seeking tort damages pursuant to the provisions of the Maine Tort Claims Act are limited to those specified in 14 M.R.S.A. § 8105-B and 8104-D.  Liability coverage shall not be deemed a waiver of any immunities of limitation of damages available under the Maine Tort Claims Act, other Maine Statutory Law, judicial precedent or common law.

> $1,000,000 per occurrence, $1,000,000 general aggregate limit of liability for all causes of action seeking tort damages pursuant to Federal Law or State Law for which immunity of limitation of damages is not provided by the provisions of the Maine Tort Claim Act (4 M.R.S.A. § 101 et seq.).

JSSMF ¶ 310.

## II.   THE PARTIES' POSITIONS

### A.     The First Amended Complaint

In his First Amended Complaint, Mr. Cote sets forth six causes of action against each Defendant:  1) Count I—Constitutional Violations Under 42 U.S.C. § 1983; 2) Count II—Intentional/Negligent Infliction of Emotional Distress; 3) Count III—Negligence—Maine Tort Claims Act—Assault; 4) Count IV—Conspiracy Under 42 U.S.C. § 1983; 5) Count V—Excessive Force; 6) Count VII—Punitive Damages.[38] *Am. Compl.* at 1-8.

### B.    The Town of Millinocket and Chief Bolduc as Chief

#### 1.    The Motion of the Town and the Chief

##### a.    Count I—Constitutional Violations Under 42 U.S.C. § 1983

At the outset, the Town of Millinocket points out that any claim against Chief Bolduc in his "official" capacity is duplicative of a claim against the Town. *Town Mot.* at 6-7; *Bolduc Mot.* at 3. Accordingly, the Town's arguments against Plaintiff's claims are made on both Chief Bolduc and the Town's behalf.  *Town Mot.* at 6-7. First, the Town contends that under Supreme Court precedent, it cannot be held vicariously liable under a respondeat superior theory for constitutional violations by an employee solely on the basis of its employment relationship with the employee. *Id.* at 7.  The Town maintains that it can be held liable under § 1983 "only when [its] official policies or customs cause the alleged constitutional deprivation."  *Id.* Furthermore, it says that there must be "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation."  *Id.* at 8.

---

[38]    There is no Count VI. *Am. Compl.* at 7.

Here, the Town contends that Mr. Cote has failed to "identify any policy that he alleges was the result of the alleged excessive force." *Id.* at 9.  Instead, the Town asserts that Mr. Cote appears to be arguing "that Defendants had a custom of failing to identify the requisite probable cause needed for an arrest and had a custom of using excessive force in making arrests that was so widespread such that Town officials, including Chief Bolduc, had constructive knowledge of the unconstitutional practice of its police." *Id.*  The Town argues that Mr. Cote has not produced evidence of any "pattern or practice of constitutional violations." *Id.*

The Town concedes that municipalities can be held liable for the acts of policymakers to the extent they have final decision-making power on policy issues, or alternatively, that they are enforcing longstanding municipal custom or policy. *Id.* at 10.  However, the Town maintains that "the Millinocket Police Department had no information concerning prior citizens' complaints for arrests or use of force involving any of the named officers." *Id.* at 12.

A final permissible theory against the Town is a failure to train its Officers to the extent that the Town's inaction "amounts to a deliberate indifference to the rights of persons within whom the police come in contact." *Id.*  The Town says that the evidence substantiates that its Officers had "significant law enforcement pre-service training and experience prior to being hired, and ongoing training thereafter." *Id.* at 14.

### b.    Count IV—Conspiracy and Counts II, III and V— State Law Claims

The town of Millinocket seeks summary judgment against the Plaintiff's claims on a variety of legal bases. *Id.* at 14-19. With respect to Mr. Cote's conspiracy claim, the Town argues that his claim fails because there is "no factual basis for a claim of 'class[-]base[d] invidiously discriminatory animus'" on the part of the town of Millinocket or Chief Bolduc. *Id.* at 14. The Town also argues that it is "immune from state tort claims, negligence, assault, battery, and intentional and negligent infliction of emotional distress under the blanket immunity provided by the [Maine] Tort Claims Act which limits torts claims to four specific areas." *Id.* Yet, the Town argues that Mr. Cote's claims do not fall within the four enumerated exceptions "nor does respondent superior liability apply under the Maine Tort Claims Act." *Id.* at 16.

Further, citing *Doucette v. City of Lewiston*, 1997 ME 157, 697 A.2d 1292, the Town explains it did not waive immunity under the Maine Torts Claims Act by obtaining limited liability insurance coverage. *Id.* at 17. Finally, the Town contends that under the Maine Tort Claims Act, governmental entities are immune for the performance of an employee's discretionary functions under § 8104-B. Therefore, when each Town employee exercised discretion to stop Mr. Cote's vehicle, investigate the situation, and arrest and bail him, they were acting within the scope of their duties and according to the Maine Tort Claims Act their discretionary decisions cannot result in liability for the Town. *Id.* at 19.

### c.    Count VII—Punitive Damages Claim

Citing *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981), the Town contends that Mr. Cote's claim for punitive damages against the Town is "without serious merit." *Id.* at 6 n.1.

### 2.   Wayne Cote's Response

#### a.   Count I—Constitutional Violations Under 42 U.S.C. § 1983

In his response, Mr. Cote turns first to the "municipal custom or policy" issue. He claims that the Town "has a history of hiring and retaining minimally qualified police officers." *Pl.'s Town Opp'n* at 6.  He points to the low scores that the Officers achieved on their tests and concludes that they were "barely qualified to do their jobs." *Id.* at 6-7.  Second, he notes that "despite hundreds of uses of force by Defendant officers over a period of several years purportedly reviewed by Defendant Bolduc, Defendant Bolduc and the town of Millinocket have failed to make a report to any State agency."[39] *Id.* at 7.

#### b.   Count IV—Conspiracy and Counts II, III and V— State Law Claims

In his response, the Plaintiff concedes that he is not pursuing these claims against the Town only and asks that the claims be dismissed. *Id.* at 9-10.

#### c.   Count VII—Punitive Damages

---

[39]   Mr. Cote also mentions the defense of the doctrine of qualified immunity. *Pl.'s Opp'n* at 7-9. However, in its reply, the Town observes that "qualified immunity is not a concept applicable to a municipality." *Town's Reply* at 3.  The Town is correct.  *See Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 166 (1993) ("[U]nlike various government officials, municipalities do not enjoy immunity from suit—either absolute or qualified—under § 1983").

Mr. Cote failed to respond to the Town's demand that the punitive damages count be dismissed. *Id.*

### 3.    The Town and Chief Bolduc's Reply

#### a.    Count I—Constitutional Violations Under 42 U.S.C. § 1983

In their reply, the Town and the Chief note that the Plaintiff concedes that the Officers met minimal standards. *Town Reply* at 2. Yet, they point out that Mr. Cote continues to claim a constitutional violation "because the Defendant officers failed to reach some unidentified standard of performance for which he provides no expert support and for which he has no evidence of a causal link between the unidentified standards and the alleged constitutional violations." *Id.* at 2-3. The Town and Chief maintain that Mr. Cote is "throwing around adjectives like 'minimally' and 'barely'" in place of a substantive factual and legal argument. *Id.*

#### b.    Count IV—Conspiracy and Counts II, III and V— State Law Claims

The Town and Chief acknowledge that the Maine Tort Claims Act Count and conspiracy claims against the Town and Chief Bolduc in his official capacity should be dismissed because Mr. Cote does not want to pursue them. *Id.* at 3.

### C.    Chief Bolduc in his Individual Capacity

### 1.    Chief Bolduc's Motion

#### a.    Count I—Constitutional Violations Under 42 U.S.C. § 1983

Chief Bolduc asserts that supervisory liability under § 1983 must be based on either "a deliberate indifference[,] failure to train, or discipline, or for the promulgation of polic[i]es which cause constitutional violations." *Bolduc Mot.* at 5. Chief Bolduc argues that Mr. Cote "has put forth no evidence to suggest either a deliberate indifference to train or implement policies which caused the constitutional violations." *Id.* at 6. Also, he contends that Mr. Cote has not produced any evidence that Chief Bolduc "has notice that the training procedures and supervision were inadequate and likely to result in a constitutional violation." *Id.* Finally, Chief Bolduc explains that none of the Defendants have been subject to discipline for excessive use of force or lack of probable cause in arrest they have made. Therefore, he contends the Mr. Cote "has failed to establish any link or causal relationship between the alleged conduct of the officers and [the] policies promoted or allegedly deliberately omitted by Chief Bolduc." *Id.* at 7.

As additional bases to dismiss Count I, Chief Bolduc argues qualified immunity given that his conduct "was well within proper supervision of officers under his command concerning Fourth Amendment policies and practices." *Id.* He asserts that his "qualified immunity from suit shields him from civil damages." *Id.* at 8.

### b.   Count IV—Conspiracy and Counts II, III and V—State Law Claims

In response to Mr. Cote's Conspiracy claim, Chief Bolduc points out that "there is no factual basis for a claim of conspiracy against [him]" and that Mr. Cote

"cannot use conclusory allegations in the Amended Complaint to support his claim of conspiracy against Chief Bolduc." *Id.* Also, with regard to Mr. Cote's state tort claims, Chief Bolduc asserts discretionary function immunity under the Maine Tort Claims Act and argues that he "was well within the established discretionary guidelines as part of his efforts in supervising his officers in the area of arrest and use of force. *Id.* at 9.

### c.   Count VII—Punitive Damages

Chief Bolduc references and adopts the Town's argument against Mr. Cote's punitive damages claim. *Id.* at 3.

### 2.   Wayne Cote's Response

### a.   Count I—Constitutional Violations Under 42 U.S.C. § 1983

Mr. Cote argues that Chief Bolduc's failure to limit contact between Officer Ingersoll and Mr. Cote given that he was aware of the "negative history" between Mr. Cote and Officer Ingersoll, amounted to "a deliberate, reckless, or callous indifference to Plaintiff's constitutional rights" and should result in supervisory liability for Chief Bolduc. *Pl.'s Bolduc Opp'n* at 3. In response to Chief Bolduc's qualified immunity argument, Mr. Cote explains that the defense should not be available to Chief Bolduc because: (1) Defendants officers used excessive force when arresting Mr. Cote and violated his Fourth Amendment rights; and (2) their actions resulted in the violation of established laws. *Id.* at 4-5.

### b.    Count IV—Conspiracy and Counts II, III and V— State Law Claims

Mr. Cote argues that there is enough evidence for a jury to decide whether the Defendants conspired to violate his constitutional rights given that they "conspired to stop Plaintiff's vehicle without probable cause that he had committed a crime, conspired to use excessive force upon Plaintiff, and conspired to cover up Plaintiff's seizure that occurred as a result of Defendants' excessive force." *Id.* at 7. Mr. Cote seems to argue that because Chief Bolduc responded to the initial complaint on October 31, 2008 and he was aware of the "negative history" between Mr. Cote and Officer Ingersoll, that Chief Bolduc was a member of the conspiracy. *Id.* at 7-8.

In response to Chief Bolduc's discretionary function immunity argument, Mr. Cote contends that excessive use of force in executing an arrest is beyond the scope of an officer's discretion and does not allow him to invoke discretionary function immunity. *Id.* at 9. Similarly, he argues that Defendants overstepped the scope of their discretion when they allegedly arrested him without probable cause. *Id.* at 9-10.

### c.    Count VII—Punitive Damages

Mr. Cote failed to respond to the Town's demand that the punitive damages count be dismissed. *Pl.'s Town Opp'n.*

### 3.    Chief Bolduc's Reply

### a. Count I—Constitutional Violations Under 42 U.S.C. § 1983

In response to Mr. Cote's Opposition Motion, Chief Bolduc argues against the § 1983 supervisory liability charge explaining that Mr. Cote "fails to address any facts that establish Chief Bolduc was either a primary actor through involvement, or a prime mover behind the underlying violation; or that there was an affirmative link through Chief[ ] Bolduc's direct participation or conduct that amounted to condemnation or tacit authorization between the supervisor's acts and the facts or omissions in the underlying violation by the subordinate." *Bolduc Reply* at 1-2. Similarly Chief Bolduc contends that there is no basis to support Mr. Cote's "negative history" argument because "there is no factual or legal support that this knowledge should have prohibited Plaintiff and Officer Ingersoll from crossing paths." *Id.* at 2. Further, Chief Bolduc reasons that Mr. Cote made "no showing that training of Millinocket police officers could have thwarted what he claims is purposeful conduct in violating constitutional rights." Additionally, he argues that there is no evidence to connect him to the Defendant Officers' allegedly unconstitutional acts or omissions because "there is no evidence [ ] [he] knew of regular excessive force or illegal arrests on the part of any of his officers to the extent that failure to supplement their training on those topics would necessarily lead to a violation of constitutional rights." *Id.* at 4.

### b. Count IV—Conspiracy and Counts II, III and V— State Law Claims

Chief Bolduc argues that Mr. Cote's suggestion that he participated in the conspiracy because he was "capable of supervising the removal of Plaintiff's belongings from his home, but decided to wait until 4:00 p.m." is an unsupported speculation of participation rather than an inference. *Id.* at 5. Further, Chief Bolduc argues that he was not part of the "casual banter," the arrest, or Mr. Cote's alleged seizure which form the basis for his conspiracy claim. *Id.*

Citing the Maine Tort Claims Act, 14 M.R.S.A. section 8111(1)(C), Chief Bolduc argues that even if the Court finds that Mr. Cote's arrest for criminal trespass is improper or that excessive force was used, Defendants, in their capacity as governmental employees, will not forfeit discretionary function immunity. *Id.* at 6.

### D.   Officer Ingersoll

#### 1.   Officer Ingersoll's Motion

##### a.   Count I—Constitutional Violations Under 42 U.S.C. § 1983

First, Officer Ingersoll argues that he and the other Defendant officers had probable cause to arrest Mr. Cote for criminal trespass. *Id.* at 3-9. Second, Officer Ingersoll contends that his "use of force was ancillary to the Taser use and minimal." *Id.* at 10. Third, he invokes qualified immunity and reasons that "his conduct fell well within his authority under the Fourth Amendment and cannot be seriously argued as violating any clearly established constitutional rights of the Plaintiff." *Id.* at 10-11.

**b.    Count IV—Conspiracy and Counts II, III and V—**

**State Law Claims**

Officer Ingersoll argues that "[t]here is no evidence of any conspiracy to violate the rights alleged by the Plaintiff." *Id.* at 11.  He asserts that Mr. Cote has made bald assertions and conclusory allegations to support his claim and has failed to show that there was a "conspiracy between Officer Ingersoll and any other officers concerning Plaintiff's arrest." *Id.*  Also, with regard to Mr. Cote's state law claims, Officer Ingersoll argues against liability by citing to discretionary function immunity. *Id.* at 12.  Under that legal theory, Officer Ingersoll insists that he was within "the established discretionary guidelines for ordering Plaintiff not to return to the area, stopping Plaintiff's vehicle and assisting to effectuate the arrest of Plaintiff" and therefore cannot be held liable for negligence, violations of the Maine Tort Claims Act, or assault. *Id.*

**2.    Wayne Cote's Response**

**a.    Count I—Constitutional Violations Under 42 U.S.C. §**

**1983**

Mr. Cote concedes that an "arguably lawful order was issued prohibiting his return to the Woodbury apartment"; however, he argues that he had no way of knowing that the order also extended to the streets adjacent to the Woodbury apartment building. *Pl.'s Ingersoll Opp'n* at 3.  Mr. Cotes urges that any "area" order was unlawful because it interfered with his constitutional right to enjoy public streets—traditional public forums—especially since he was operating his vehicle in a

safe and legal manner.  *Id.* at 5.  Mr. Cote insists that issues of fact remain for the jury, namely: (1) whether the order, as communicated, constituted a lawful order prohibiting Mr. Cote from being on streets adjacent to 90 Rhode Island Avenue; and (2) whether Mr. Cote even saw Eugene Wolfe in the afternoon of October 31, 2008. *Id.* at 7.

Further, Mr. Cote contends that under Maine law there was no probable cause for his arrest given that his arrest was based on the claim of a tenant who lived on Cottage Road and not based on the Defendant officers' first-hand account of criminal behavior.  *Id.* at 9.  He concedes that Officer Ingersoll may have had probable cause to summons Mr. Cote for criminal trespass but insists that Officer Ingersoll did not have statutory authority to arrest Mr. Cote.  *Id.* at 10.

Citing *Graham v. Connor*, 490 U.S. 386 (1989), Mr. Cote argues that Officer Ingersoll engaged in excessive force because Mr. Cote (1) did not commit a crime, (2) did not pose an immediate threat to responding officers or others, and (3) he was not actively resisting arrest or attempting to evade arrest by flight. *Id.* at 396-97; *Pl.'s Ingersoll Opp'n* at 10-12.  He also argues that "Defendants' actions were [ ] not consistent with Millinocket Police Department policy."  *Id.* at 12.

### b.     Count IV—Conspiracy and Counts II, III and V— State Law Claims

With respect to his opposition to Officer Ingersoll's conspiracy arguments, Mr. Cote refers the Court to his analysis in his Opposition Motion to Sergeant Cox's Motion for Summary Judgment.  *Id.* at 13; *Pl.'s Cox Opp'n* at 5-8.  Similarly, Mr.

Cote refers the Court to the discussion of his state law claims found in his Opposition Motion to Officer Theriault's Motion for Summary Judgment. *Id.* at 14; *Pl.'s Cox Opp'n* at 8-9.

### 3. Officer Ingersoll's Reply

#### a. Count I—Constitutional Violations Under 42 U.S.C. § 1983

Citing *Logue v. Dore*, 103 F.3d 1040 (1st Cir. 1997), Officer Ingersoll argues against Mr. Cote's claims that the Defendants arrested him without probable cause. *Id.* at 1044; *Ingersoll Reply* at 4. Officer Ingersoll contends that based upon "the factual circumstances leading up to Plaintiff's arrest, including Plaintiff's failure to retrieve his belongings, his refusal to leave the area, his continued circling the area and stopping by an apartment within Ms. Woodbury's single building complex, at least arguably" gave the Defendants probable cause to arrest him for criminal trespass. *Ingersoll Reply* at 4.

#### b. Count IV—Conspiracy and Counts II, III and V— State Law Claims

With respect to Mr. Cote's conspiracy claim, Officer Ingersoll argues that he had no role in setting Mr. Cote's bail, that he did not film the arrest because his cruiser was not in a position to film it, and therefore Mr. Cote has pled facts that "hardly infer[ ] the existence of a conspiracy or a conspiratorial act." *Ingersoll Reply* at 6.

### E. Sergeant Cox

1.      **The Motion of Sergeant Cox**

    a.      **Count I—Constitutional Violations Under 42 U.S.C. §**
        **1983**

First, Sergeant Cox argues that "the Fourth Amendment claim for the Plaintiff's stop and arrest as against Sergeant Cox is without serious merit" given the circumstances of the arrest. *Id.* at 4. Second, Sergeant Cox contends that should the Court find the Defendants' committed a technical violation in their criminal trespass arrest, Sergeant Cox is protected by qualified immunity because his "conduct fell well within his authority under the Fourth Amendment." *Id.* at 4, 8-9.

Sergeant Cox also explains that he and the Defendants did not engage in an unreasonable seizure or use excessive force in their arrest of Mr. Cote because they "were confronted with a situation where Plaintiff was simply not willing to submit to arrest." *Id.* at 6. Further, he argues that the "decision to use the Taser was within Millinocket Police Department policy and the case law which permits the level of force 'consistent with the amount of force that a reasonable police officer would think necessary to bring the arrestee in custody.'" *Id.* at 7.

    b.      **Count IV—Conspiracy and Counts II, III and V—**
        **State Law Claims**

With regard to Count IV, Sergeant Cox states that "[t]here is no evidence of any conspiracy to violate the rights alleged by the Plaintiff" and that Mr. Cote "confuses legitimate police tactical planning, which was remarkably accurate in its

prediction of Plaintiff's behavior, with discriminatory conspiracy." *Id.* at 10-11.  In disputing Mr. Cote's state tort claims Sergeant Cox argues that he is immune from suit because of discretionary function immunity.  *Id.* at 11-12.  He argues his actions the day of Mr. Cote's arrest were "so closely tied' with [ ] [his] job duties [ ] [that he] is entitled to discretionary function immunity." *Id.* at 13.  Citing *Bowen v. Department of Human Services*, 606 A.2d 1051 (Me. 1992), Sergeant Cox further explains that even if the officer is found to have engaged in allegedly illegal conduct that does not relieve the officer of discretionary function immunity. *Id.* at 1055; *Cox Mot.* at 13.

## 2.     Wayne Cote's Response

### a.     Count I—Constitutional Violations Under 42 U.S.C. § 1983

Relating to Sergeant Cox's qualified immunity arguments, Mr. Cote points out that Defendants are not entitled to qualified immunity because they violated his constitutional rights in violation of established laws.  *Id.* at 3-4.  Further, he argues that the Defendants' use of force during his arrest was excessive under the factors listed in *Graham v. Connor*.  *Id.* at 4.  Finally, Mr. Cote asks the Court to follow *Barber v. Guay*, 910 F. Supp. 790 (D. Me. 1995), and accordingly deny summary judgment for Defendants on the basis of qualified immunity.  *Id.* at 5.

### b.     Count IV—Conspiracy and Counts II, III and V— State Law Claims

Mr. Cote urges the Court to deny Defendant's Motion for Summary Judgment because he has set forth circumstantial evidence to prove that Defendants "conspired to stop Plaintiff's vehicle without probable cause that he had committed a crime, conspired to use excessive force upon Plaintiff, [ ] conspired to cover up Plaintiff's seizure that occurred as a result of Defendants' excessive force," and somehow influenced the "extraordinary bail" set for him. *Id.* at 6-7. Mr. Cote emphasizes the fact that when Officer Ingersoll made remarks that he would "bust" Mr. Cote's window and "put the knuckles to" him, that Sergeant Cox, a superior officer, did not say a word of disagreement. *Id.*

### 3. Sargent Cox's Reply

#### a. Count I—Constitutional Violations Under 42 U.S.C. § 1983

Sergeant Cox argues that Graham's three-factor test for determining unreasonable seizures and use of excessive force, weighs in the Defendants' favor given that Mr. Cote (1) concedes he committed a Class E crime; (2) selectively fails to place the crime in context and omits that by circling the property where he was asked to leave he put the officers and others at risk; and (3) did in fact resist arrest and try to flee police officers. *Id.* at 1-3. Further, Sergeant Cox contends that he did not violate Millinocket Police Department policy when he deployed his Taser because its use was warranted by Mr. Cote's non-compliance during his arrest. *Id.* at 3.

Citing several cases, Sergeant Cox argues that "Millinocket officers did not necessarily need probable cause, only a reasonable belief that there was probable cause to arrest Plaintiff in order to come within the defense of qualified immunity." *Id*. at 4. Further, Sergeant Cox analogizes his situation to that of the officers in *Barber v. Guay*, 910 F. Supp. 790 (D. Me. 1995) and explains that "[l]ike in *Barber*, the Defendant officers had a reasonable and arguable basis to believe that [ ] [Mr. Cote] was in violation of the order . . . thus [ ] [he] cannot satisfy the first [element] of the test of establishing that his right to be free of arrest without probable cause was violated." *Id*.

### b. Count IV—Conspiracy and Counts II, III and V— State Law Claims

Sergeant Cox then argues that "[a]bsent [ ] broad sweeping allegations Plaintiff offers no factual support specific to Sergeant Cox [sic]" and Mr. Cote fails to connect him to an alleged conspiracy. *Id*. Also, Sergeant Cox contends that Mr. Cote's conspiratorial inference drawn from Sergeant Cox's comment "that there was nothing illegal in driving on public roads" and his subsequent actions, is misplaced because the factual situation changed and allowed Defendants to engage in an arrest after Sergeant Cox made that statement. *Id*.

### F. Officer Theriault

#### 1. Officer Theriault's Motion

##### a. Count I—Constitutional Violations Under 42 U.S.C. § 1983

With respect to Mr. Cote's Fourth Amendment complaint, Officer Theriault argues that beyond Sergeant Cox's use of the Taser, Mr. Cote "makes only generic references to force" and does not specifically link Officer Theriault to any "particular force or involvement." *Id.* at 4. Also, Officer Theriault explains that because Mr. Cote has not proven Defendants used excessive force during his arrest, she cannot be held liable for failing to intervene and stop Sergeant Cox. *Id.* Moreover, she argues that she was not in a "position to intervene to prevent the use of the Taser by Sergeant Cox, who made a split second decision on when to deploy it." *Id.* at 5. Finally, Officer Theriault argues that she is entitled to qualified immunity because he conduct in assisting Officer Ingersoll and Sergeant Cox "fell within her authority under the Fourth Amendment." *Id.* at 9.

### b. Count IV—Conspiracy and Counts II, III and V— State Law Claims

Officer Theriault asserts that her mere presence when the Taser was used and Mr. Cote was arrested does not support Mr. Cote's claim that she was part of a conspiracy to violate his rights. *Theriault Mot.* at 10. Further, she argues that she is entitled to discretionary function immunity under the Maine Tort Claims Act because she "was engaged in reasonable acts designed to assist in the arrest of Plaintiff for criminal trespass." *Id.* at 11.

### 2. Wayne Cote's Response

### a. Count I—Constitutional Violations Under 42 U.S.C. § 1983

Initially, Mr. Cote argues that although Officer Theriault was "mostly an observer" to the interactions between Mr. Cote and the other Defendants, she may still be held liable because she took no steps to prevent Mr. Cote from being harmed by Officer Ingersoll and Sergeant Cox. *Pl.'s Theriault Opp'n* at 3. He also argues that Officer Theriault had a "realistic opportunity to prevent the excessive force and she was in a position to intervene in the events that occurred on October 31, 2008." *Id*. Finally, Mr. Cote asserts that Officer Theriault's conduct violated Millinocket Police Department policy and that she is not entitled to qualified immunity. *Id*. at 4-5; *Pl.'s Bolduc Opp'n* at 3-6.

### b.      Count IV—Conspiracy and Counts II, III and V— State Law Claims

Mr. Cote repeats the general arguments he has asserted against the Defendants and specifically argues that Officer Theriault was part of the conspiracy to violate his rights given she "laughed" at Officer Ingersoll's remarks that he would "bust" Mr. Cote's window, "go hands on," and "put the knuckles to" Mr. Cote. *Pl.'s Theriault Opp'n* at 5-7. Further, Mr. Cote contends that Officer Theriault's failure to mention Mr. Cote's seizure in her police report is additional evidence that she was part of a conspiracy against him. *Id*. at 7. Finally, Mr. Cote argues that Defendants are not entitled to discretionary function immunity because they used excessive force when arresting him. *Id*. at 9.

### 3.      Officer Theriault's Reply

### a.   Count I—Constitutional Violations Under 42 U.S.C. § 1983

First, Officer Theriault argues that Mr. Cote essentially concedes that he did not properly plead a "failure to intervene" theory against her and therefore his claim against her should be dismissed.  *Id.* at 2.  Second, she contends that because Mr. Cote did not offer evidence of Officer Theriault's particular conduct that would preclude her from qualified immunity, she is entitled to that immunity from suit. *Id.* at 3.

### b.   Count IV—Conspiracy and Counts II, III and V— State Law Claims

With respect to Mr. Cote's conspiracy claim, Officer Theriault argues that the fact that she "laughed" at Officer Ingersoll's remarks is not enough to demonstrate her participation in a conspiracy to violate Mr. Cote's civil rights.  *Id.* at 5.  She emphasizes that there was no conspiratorial agreement because Sergeant Cox rejected Officer Ingersoll's comments within three seconds after they were made. *Id.*  Finally, Officer Theriault argues that "Plaintiff's failure to direct argument at her conduct [failure to respond] constitutes a waiver of these state law claim[s]."  *Id.* at 7.

## III.   DISCUSSION

### A.   Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." FED. R. CIV. P. 56(a).  A fact is "material" if it "has the potential to change the outcome of the suit." *Tropigas de Puerto Rico, Inc. v. Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011) (quoting *McCarthy v. Nw. Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir. 1995)).  An issue is "genuine" if "a reasonable jury could resolve the point in favor of the nonmoving party." *Id.* (quoting *McCarthy*, 56 F.3d at 315).

Once this evidence is supplied by the moving party, the nonmovant must "produce 'specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue.'" *Triangle Trading Co., Inc. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999) (quoting *Morris v. Gov't Dev. Bank of Puerto Rico*, 27 F.3d 746, 748 (1st Cir. 1994)).  In other words, the non-moving party must "present 'enough competent evidence' to enable a factfinder to decide in its favor on the disputed claims." *Carroll v. Xerox Corp.*, 294 F.3d 231, 237 (1st Cir. 2002) (quoting *Goldman v. First Nat'l Bank of Boston*, 985 F.2d 1113, 1116 (1st Cir. 1993)).  The Court then "views the facts and draws all reasonable inferences in favor of the nonmoving party." *Ophthalmic Surgeons, Ltd. v. Paychex, Inc.*, 632 F.3d 31, 35 (1st Cir. 2011).  However, the Court "afford[s] no evidentiary weight to 'conclusory allegations, empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative.'" *Tropigas*, 637 F.3d at 56 (quoting *Rogan v. City of Boston*, 267 F.3d 24, 27 (1st Cir. 2001)); *accord Sutliffe v. Epping Sch. Dist.*, 584 F.3d 314, 325 (1st Cir. 2009); *Carroll*, 294 F.3d at 237.

### B.      Wayne Cote's Claims Against the Town of Millinocket and Chief Bolduc as Chief

#### 1.      Count I—Constitutional Claims Under 42 U.S.C. § 1983

In *Monell v. Department of Social Services*, the United States Supreme Court held that municipal entities are subject to § 1983 liability but not on the basis of respondeat superior.  436 U.S. 658, 663 (1978) ("[W]e now overrule *Monroe v. Pape*, insofar as it holds that local governments are wholly immune from suit under § 1983"); *Marrero-Rodriguez v. Municipality of San Juan*, 677 F.3d 497, 503 (1st Cir. 2012).  The same principles that apply to the town of Millinocket apply to Mr. Cote's claim against Chief Bolduc in his capacity as Chief of Police and to this extent, the Court treats the claims against the Town and the Chief simultaneously and has shorthanded the official capacity claims against the Chief by referring only to the municipality.  *Brandon v. Holt*, 469 U.S. 464, 472 n.21 (1985); *Wood v. Hancock Cnty. Sheriff's Dep't*, 354 F.3d 57, 58 n.1 (1st Cir. 2003) ("[T]he individuals were sued only in their official capacities.  As such their liability under 42 U.S.C. § 1983 is indistinguishable from the county's").

In general, a municipality may be held liable under § 1983 for deliberate indifference in training, *City of Canton v. Harris*, 489 U.S. 378, 380 (1989), in supervision or discipline, *Camilo-Robles v. Hoyos*, 151 F.3d 1, 6-7 (1st Cir. 1998), in hiring, *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 410-11 (1997), and in failing to adopt policies to prevent constitutional violations.  The deliberate indifference standard is "a stringent standard of fault, requiring proof that a municipal actor

disregarded a known or obvious consequence of his action" or inaction.  *Connick v. Thompson*, 131 S. Ct. 1350, 1360 (2011) (quoting *Bd. of Cnty. Comm'r Office v. Brown*, 520 U.S. 397, 410 (1997)); *Porto v. Town of Tewksbury*, 488 F.3d 67, 73 (1st Cir. 2007).  "To demonstrate deliberate indifference a plaintiff must show (1) a grave risk of harm, (2) the defendant's actual or constructive knowledge of that risk, and (3) his failure to take easily available measures to address the risk."  *Camilo-Robles*, 151 F.3d at 7.  Furthermore, § 1983 imposes a causation requirement: "a § 1983 plaintiff ordinarily must show that the [municipality] through its deliberate conduct . . . was the 'moving force' behind the injury alleged."  *Surprenant v. Rivas*, 424 F.3d 5, 19 n.6 (1st Cir. 2005) (quoting *Bd. of Cnty Comm'rs*, 520 U.S. at 404).

Here, Mr. Cote's focus is on the Town's hiring and retention practices.  "[B]efore holding a municipality liable for a police officer's excessive force, we have required plaintiffs to prove that the municipality knew that the excessive force would be a 'plainly obvious consequence' of hiring the officer."  *Porto*, 488 F.3d at 73 (quoting *Crete v. City of Lowell*, 418 F.3d 54, 66 (1st Cir. 2005)).  Similarly, to the extent a municipality may be liable under § 1983 for a failure to train, the municipality would first have to have been placed on notice of inappropriate actions by the officer and would have to do "nothing or fail[] to take additional reasonable measures after it learned that its initial remedies were ineffective."  *Id.* at 74 (citing *Wills v. Brown Univ.*, 184 F.3d 20, 26 (1st Cir. 1999) (addressing liability in an educational setting).

Although Mr. Cote makes the bald assertion that "many of the officers involved in this lawsuit received scores [on mandatory competency quizzes] indicating that they were barely qualified to do their jobs," *Pl.'s Town Opp'n* at 6-7, the record does not support his assertion. Three officers were directly involved in the Cote arrest: Sergeant Cox, Officer Ingersoll, and Officer Theriault, and Chief Bolduc was more tangentially involved. JSSMF ¶¶ 125-306. Regarding Sergeant Cox, the sole reference in the record to his scores on quizzes is that he "received a passing grade of 80% on fourteen quizzes between June 2007 and June 2009." JSSMF ¶ 28. Regarding Officer Ingersoll, the record only says that he "scored minimum passing grades on twenty-two quiz scores taken between December 2006 and June 2009" and a "minimum grade on the 'Awareness of People with Mental Retardation Quiz.'" JSSMF ¶¶ 53-54. Regarding Officer Theriault and Chief Bolduc, there is no reference at all to their performances on Police Department quizzes.

Even when viewed in a light most favorable to him, these facts, standing alone, do not support Mr. Cote's hiring and retention claims against the municipality. The record only says that Sergeant Cox received "a passing grade of 80% on fourteen quizzes." The record does not state what grades he received on the remainder and the Court will not infer that he failed or aced the rest. Furthermore, a score of 80% on a test is acceptable as are Officer Ingersoll's "minimum passing grades" and a "minimum grade." As presented, Sergeant Cox's

and Officer Ingersoll's test scores are not, in the Court's view, a matter of constitutional magnitude.

Second, there is no context.  For example, the record does not reveal how many quizzes were conducted on Sergeant Cox and Officer Ingersoll, only that Sergeant Cox received a passing grade on 80% of fourteen quizzes between June 2007 and June 2009 and that Officer Ingersoll secured minimum passing grades on twenty-two quiz scores between December 2006 and June 2009.  Also, there is no record about the content of the quizzes, whether the topics were relevant to the issues in this case, and, if so, how the Officers scored on areas directly related to the facts in this case.  Furthermore, there is no causation.  The record confirms that both Sergeant Cox and Officer Ingersoll passed a high percentage of the quizzes, not that they failed them, and in any event, there is no logical inference that a police officer who attains superlative grades on department quizzes is less likely to be involved in the type of incident in this case than an officer who receives just passing grades.

Moreover, Mr. Cote concentrates on only one aspect of an officer's competence.  His position ignores their other educational achievements and their experience as police officers.  Here, each officer had graduated from the Maine Criminal Justice Academy, and Sergeant Cox and Officer Theriault had attended college: Sergeant Cox at the University of Maine in Bangor and Officer Theriault at the University of Maine in Presque Isle and further training at the University of Maine in Augusta.  JSSMF ¶¶ 14, 16, 36, 73.  Sergeant Cox had prior employment

as a police officer for another town and had been employed in law enforcement in Millinocket since 1992.  JSSMF ¶ 14.  Officer Ingersoll also had prior employment as a police officer for another town and had been employed in law enforcement in Millinocket since 1999.  JSSMF ¶ 40.  Officer Theriault had been employed as a reserve officer in Millinocket since 2004.[40]  JSSMF ¶ 74.  Notably, the fact that the town of Millinocket routinely subjected its police officers to quizzes undercuts Mr. Cote's contention that the Town was deliberately indifferent to their ongoing competence and training.

Mr. Cote's blanket contention that the Town failed to properly report instances of the use of force to the appropriate state agencies also fails.  Again, there is no context.  Mr. Cote asserts that the town of Millinocket failed to file reports with the state of Maine "despite hundreds of uses of force by Defendant officers over a period of several years" that were "purportedly reviewed by Defendant Bolduc."  *Pl.'s Town Opp'n* at 7.  As the Town points out, the state of Maine reporting requirement is not every use of force, but uses of excessive force.  *Town's Reply* at 3 (citing DSMF ¶¶ 122-24, PRDSMF ¶¶ 122-24) (discussing the Maine Criminal Justice Academy Report on Excessive Force Complaints).  Mr. Cote has presented no evidence that any of the uses of force by the Millinocket Police Department should have been reported as excessive force to the state of Maine.

Finally, as the United States Supreme Court explained in *Connick*, in order to prove a claim that the municipality had committed a constitutional violation by

---

[40]     Although Mr. Cote frames this case as both a failure to properly hire and retain, there is no evidence in this record that the town of Millinocket's hiring practices are at issue.  At best, Mr. Cote's claim is a failure to properly retain.

lack of training, a plaintiff must ordinarily present evidence of a "pattern of similar constitutional violations." *Connick*, 131 S. Ct. at 1360. As the *Connick* Court observed, "[w]ithout notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id.* Here, there is no evidence of a "pattern of similar constitutional violations" that resulted from the town of Millinocket's alleged failure to properly hire or train.

The Court concludes that passing grades on Police Department quizzes and an absence of reports of excessive force do not generate a genuine issue of fact as to the municipality's § 1983 liability.

### 2.      Count IV—Conspiracy Under 42 U.S.C. § 1983

After the Town moved for summary judgment on Count IV, the conspiracy count, Mr. Cote decided not to pursue the Count as against the Town and moved to dismiss it. *Pl.'s Town Opp'n* at 9. In view of the Plaintiff's request that the Count be dismissed, the Court will grant the Plaintiff's motion to dismiss but with prejudice in order to have the same legal effect as the granting of a motion for summary judgment.

### 3.      Counts II—Intentional/Negligent Infliction of Emotional Distress, Count III—Negligence—Maine Tort Claims Act—Assault, and Count V—Excessive Force

After the Town moved for summary judgment on the state law claims, Count II, intentional/negligent infliction of emotional distress, Count III, negligence, Maine

Tort Claims Act, and assault, and Count V, excessive force,  Mr. Cote decided not to pursue these Counts and moved to dismiss them.  *Pl.'s Town Opp'n* at 9-10.  In view of the Plaintiff's request that the Counts be dismissed, the Court will grant the Plaintiff's motion to dismiss but with prejudice in order to have the same legal effect as the granting of a motion for summary judgment.

### 4.    Count VII—Punitive Damages

In *Newport v. Fact Concerts*, the United States Supreme Court found "that considerations of history and policy do not support exposing a municipality to punitive damages for the bad-faith actions of its officials."  *Newport*, 453 U.S. at 271.  It held that "a municipality is immune from punitive damages under 42 U.S.C. § 1983."  *Id.*; *see Bisbal-Ramos v. City of Mayaguez*, 467 F.3d 16, 21 n.3 (1st Cir. 2006); *Godin v. Machiasport Sch. Dep't Bd. of Dirs.*, 831 F. Supp. 2d 380, 390 (D. Me. 2011).  Even if the constitutional claim against the Town survived, the Town would be entitled to summary judgment on the punitive damages count.

### C.    Chief Bolduc in his Individual Capacity

### 1.    Count I — Constitutional Claims

In Count I, Mr. Cote is pursuing a claim of supervisory liability under § 1983 against Don Bolduc in his individual capacity.  *Pl.'s Bolduc Opp'n* at 3.  In *Iqbal*, the United States Supreme Court described the term "supervisory liability" under § 1983 as "a misnomer."  *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009).  The Court explained that "[a]bsent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct."  *Id.*  To establish a

claim of supervisory liability under § 1983, therefore, a plaintiff must predicate the claim, not upon respondeat superior, but upon the supervisor's "own acts or omissions." *Sanchez v. Pereira-Castillo*, 590 F.3d 31, 49 (1st Cir. 2009).

As the First Circuit observed, "supervisory liability typically arises in one of two ways: either the supervisor may be a 'primary violator or direct participant in the right-violating incident,' or liability may attach 'if a responsible official supervises, trains, or hires a subordinate with deliberate indifference toward the possibility that deficient performance of the task eventually may contribute to a civil rights deprivation.'" *Id.* (quoting *Camilo-Robles v. Zapata*, 175 F.3d 41, 44 (1st Cir. 1999)). "In the latter scenario . . ., the analysis focuses on 'whether the supervisor's actions displayed a deliberate indifference toward the rights of third parties and had some causal connection to the subsequent tort.'" *Id.* In either case, the plaintiff in a § 1983 action "must show an 'affirmative link, wither through direct participation or through conduct that amounts to condonation or tacit authorization,' between the actor and the underlying violation." *Id.*

In his response, Mr. Cote describes the basis for his supervisory liability claim against Chief Bolduc:

> Defendant Bolduc was aware of the negative history between Plaintiff and Defendant Ingersoll. Plaintiff had complained to Defendant Bolduc about Defendant Ingersoll on several occasions. Defendant Bolduc and another officer were capable of supervising the removal of Plaintiff's belongings from his home on the morning of October 31, 2008. However, despite Defendant Bolduc's knowledge of the history between Plaintiff and Defendant Ingersoll, Defendant Bolduc instructed Plaintiff to return to 90 Rhode Island Avenue at 4:00 p.m. to remove his belongings, a time when Defendant Bolduc was aware that

> Defendant Ingersoll would be working and would be one of the officers
> who responded to 90 Rhode Island Avenue.

*Pl.'s Bolduc Opp'n* at 3.  It is this action by Chief Bolduc that Mr. Cote contends amounts to "deliberate, reckless or callous indifference to Plaintiff's constitutional rights that is prohibited in the case of *City of Canton v. Harris*, 489 U.S. 387 (1989)." *Id.*

The Court disagrees.  First, Officer Ingersoll's prior law enforcement contacts with Mr. Cote, consisting of Mr. Cote's allegation that three years earlier Officer Ingersoll was reckless when he drew his revolver after Mr. Cote led the police on a high speed chase and that at some other time, Officer Ingersoll was rude to him during a traffic stop for a cracked windshield, could hardly place Chief Bolduc on notice that Officer Ingersoll would likely violate Mr. Cote's civil rights.  Second, although Mr. Cote had been involved in a domestic dispute that morning, the four o'clock pick up time allowed a cooling off period for Mr. Cote, making it less likely that the event would turn ugly.  Furthermore, all Chief Bolduc expected Officer Ingersoll to do was supervise Mr. Cote's retrieval of his personal property and leave, something that would have been accomplished without confrontation if Mr. Cote had simply picked up his belongings and left.

Fourth, even crediting Mr. Cote's contention that Officer Ingersoll's prior contact with Mr. Cote should have caused Chief Bolduc some concern, Officer Ingersoll was not the only Millinocket police officer at the scene.  He arrived with Officer Theriault, who had no history of any untoward contact with Mr. Cote, and the presence of two officers made it less likely that what seemed to be a relatively

routine police duty would provide the opportunity for some type of rogue action by one officer.  Fifth, the allegations against Chief Bolduc fail to establish causation: whatever the state of Chief Bolduc's knowledge of the prior contact between Officer Ingersoll and Mr. Cote, Mr. Cote has no evidence that Chief Bolduc's decision to assign a 4 o'clock pick up time caused the later cascade of events that now form the basis of Mr. Cote's current cause of action.

Finally, there is no evidence that Chief Bolduc knew that Sergeant Cox and Officers Ingersoll and Theriault were going to stop Mr. Cote's motor vehicle and forcibly arrest him merely for circling around 90 Rhode Island Avenue.  In fact, the record is to the contrary.  According to the stipulation of the parties, while the Officers were still at 90 Rhode Island Avenue before they took off after Mr. Cote, Sergeant Cox told Chief Bolduc, "He's just circling around and around; nothing says he can't do that."  JSSMF ¶ 214.  It was shortly thereafter that the Officers got into their police cruisers and pursued Mr. Cote to effect an arrest.

### 2.    Qualified Immunity

"Qualified immunity shields state officials from civil damage liability under section 1983, insofar as their conduct does not violate 'clearly established' rights of which 'a reasonable person would have known' at the time of the conduct in question."  *Rivera-Ramos v. Roman*, 156 F.3d 276, 279 (1st Cir. 1998) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  In *Rivera-Ramos*, the First Circuit explained:

> This court has made it crystal clear, on a number of occasions, that
> identifying some abstract constitutional right extant at the time of the

> alleged violation does not itself show that the conduct alleged is a violation of 'clearly established' law.  Instead the focus must be upon the particular conduct engaged in by (or attributed to) the defendants; immunity is forfeited only if a reasonable official would clearly understand *that conduct* to be a violation of the Constitution.  The need to focus on specific facts is so well-settled that the issue need not be discussed further.

*Id.* at 279-80.  "The qualified immunity doctrine provides defendant public officials an immunity from suit and not a mere defense to liability."  *Maldonado v. Fontanes*, 568 F.3d 263, 268 (1st Cir. 2009).  The qualified immunity inquiry is a two-part test; "[a] court must decide: (1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was 'clearly established' at the time of the defendant's alleged violation."  *Id.* at 269 (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)).

Here, although Mr. Cote contends that his Fourth Amendment rights were violated by an illegal motor vehicle stop and by the use of excessive force in making an arrest, Mr. Cote does not tailor this argument to Chief Bolduc's role.  As just pointed out, there is simply nothing in this record, even viewed in the light most favorable to Mr. Cote, that allows the Court to conclude Chief Bolduc engaged in conduct that a reasonable officer would have understood violated a clearly established right.  *Maldonado*, 568 F.3d at 269.

Chief Bolduc is entitled to summary judgment on Count I, Mr. Cote's § 1983 claim.

### 3.   Chief Bolduc and Count IV—Conspiracy

In Count IV, Mr. Cote alleges that Chief Bolduc engaged in an illegal conspiracy with other Millinocket police officers to violate his civil rights. *Am. Compl.* at 7. According to Mr. Cote, the gravamen of this Count is that the "Defendants conspired to stop Plaintiff's vehicle without probable cause that he had committed a crime, conspired to use excessive force upon Plaintiff, and conspired to cover up Plaintiff's seizure that occurred as a result of Defendants' excessive force." *Pl.'s Bolduc Opp'n* at 6-7. Although the Court carefully reviewed Mr. Cote's legal memorandum to determine what part Chief Bolduc played in this alleged conspiracy, the only mention of Chief Bolduc is his role in setting 4 o'clock as the time for Mr. Cote to pick up his personal belongings. Mr. Cote does not claim that Chief Bolduc had any direct or indirect involvement in the decisions of the Officers at the scene to pursue and arrest him. For the same reasons the Court has explained, these allegations do not generate a genuine issue of material fact against Chief Bolduc and the conspiracy Count as against him must fail.

### 4.    Chief Bolduc and the State Law Claims

In Count II, Intentional/Negligent Infliction of Emotional Distress, Count III, Negligence and Assault, and Count V, Excessive Force, Mr. Cote makes a number of state tort claims against Chief Bolduc. *Am. Compl.* at 6-7. In his motion, Chief Bolduc asserts "defenses of discretionary function immunity under 14 M.R.S.A § 8111 and immunity to the extent of damages under 14 M.R.S.A § 8104-D." *Bolduc Mot.* at 8.

Maine law grants "governmental employees absolute immunity when performing a discretionary act . . . as long as that act is 'encompassed by the duties of the governmental employee.'" *Richards v. Town of Eliot*, 2001 ME 132, *23, 780 A.2d 281, 292 (quoting 14 M.R.S.A. § 8111(1)(C)). "If a police officer's conduct exceeds the scope of his discretion, he may lose the immunity." *Id.* The Maine Supreme Judicial Court has established four criteria to determine whether an act or omission qualifies as discretionary:

> (1) Does the challenged act, omission, or decision necessarily involve a basic governmental policy, program or objective? (2) Is the questioned act, omission, or decision essential to the realization or accomplishment of that policy, program, or objective as opposed to one which would not change the course or direction of the policy, program, or objective? (3) Does the act, omission, or decision require the exercise of basic policy evaluation, judgment, and expertise on the part of the governmental agency involved? (4) Does the governmental agency involved possess the requisite constitutional, statutory, or lawful authority and duty to do or make the challenged act, omission, or decision?

*Quintal v. City of Hallowell*, 2008 ME 155, ¶ 34, 956 A.2d 88, 96-97.

Again, in evaluating Mr. Cote's claims against Chief Bolduc, the record is bereft of any suggestion that he actually participated in the decision to arrest Mr. Cote or in carrying out that decision. He was not at the scene of the arrest and did not inflict any emotional distress, did not assault, and did not use excessive force against Mr. Cote. JSSMF ¶¶ 125-306. The sole basis for Mr. Cote's state law tort claims against Chief Bolduc seems to be that he fixed 4 o'clock as the hour for Mr. Cote to return to 90 Rhode Island Avenue, when he knew that Officer Ingersoll would be present. Whatever else might be said, a decision by a chief of police to

assign a patrol officer to respond to the scene of a domestic disturbance meets all four *Quintal* criteria.   The Court concludes that Chief Don Bolduc is entitled to summary judgment on the state tort claims, Counts II, III, and V, under the discretionary function immunity provisions of Maine law.

### 5.   Don Bolduc's Motion for Summary Judgment on Punitive Damages

Because the Court has granted Chief Bolduc's motion for summary judgment on all underlying claims, Mr. Cote cannot maintain Count VII, his punitive damages count.   *Frank v. L.L. Bean, Inc.*, 352 F. Supp. 2d 8, 13 (D. Me. 2005) ("[P]unitive damages is not a separate and distinct cause of action under Maine law. Rather, it is a type of remedy"); *Goldenson v Steffens*, 802 F. Supp. 2d 240, 270 (D. Me. 2011).   Without a wrong by Chief Bolduc, Mr. Cote cannot be entitled to a remedy against him.

### D.   Officer Ingersoll's Motion for Summary Judgment

#### 1.   The Constitutional Claim

Mr. Cote's § 1983 claim against Officer Ingersoll has two bases: an allegedly unlawful arrest and the use of allegedly excessive force in effecting the arrest.   *Pl.'s Ingersoll Mot.* at 2-13.   Mr. Cote maintains that in effecting an unlawful arrest, Officer Ingersoll violated his Fourth Amendment right to be free from unreasonable searches and seizures and that in using excessive force, Officer Ingersoll violated the Fourth, Eighth and Fourteenth Amendments.   *Am. Compl.* at 5.

##### a.   The Arrest

Turning first to the arrest, under well-developed Supreme Court law, "a warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004).  Put differently, "[t]he Fourth Amendment right to be free from unreasonable seizures of the person demands that an arrest be supported by probable cause." *Santiago v. Fenton*, 891 F.2d 373, 383 (1st Cir. 1989).  Probable cause exists when "police officers, relying on reasonably trustworthy facts and circumstances, have information upon which a reasonably prudent person would believe the suspect had committed or was committing a crime." *United States v. Vongkaysone*, 434 F.3d 68, 73 (1st Cir. 2006).  The probable cause analysis entails "'an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time,' and not on the officer's actual state of mind at the time the challenged action was taken." *Maryland v. Macon*, 472 U.S. 463, 470 (1985) (quoting *Scott v. United States*, 436 U.S. 128, 136 (1978)) (internal citation omitted).

In the circumstances of this case, if Officer Ingersoll had probable cause to arrest Wayne Cote, it would have been for criminal trespass.  *Ingersoll Mot.* at 3; *Pl.'s Ingersoll Opp'n* at 8.  Maine law provides:

1. A person is guilty of criminal trespass if, knowing that that person is not licensed or privileged to do so, that person:
    . . .
        E. Remains in any place in defiance of a lawful order to leave that was personally communicated to that person by the owner or another authorized person.  Violation of this paragraph is a Class E crime;

F. Enters any place in defiance of a lawful order not to enter that was personally communicated to that person by the owner or another authorized person.  Violation of this paragraph is a Class E crime[.]

17-A M.R.S. § 402(1)(D), (E).  A Class E crime is a misdemeanor under Maine criminal law and subjects the person to a "definite period not to exceed 6 months." 17-A M.R.S. § 1252(2)(E).  Under 17-A M.R.S. § 15(B), Maine law restricts the instances in which a law enforcement officer may arrest a person without a warrant:

… [A] law enforcement officer may arrest without a warrant:

B.  Any person who has committed or is committing in the officer's presence any Class D or Class E crime.

17-A M.R.S. § 15(1)(B).  The statute defines "officer's presence":

For purposes of subsection 1, paragraph B, criminal conduct has been committed or is being committed in the presence of a law enforcement officer when one of more of the officer's senses afford that officer personal knowledge of facts that are sufficient to warrant a prudent and cautious law enforcement officer's belief that a Class D or Class E crime is being or has just been committed and that the person arrested has committed or is committing that Class D or Class E crime.

17-A M.R.S. § 15(2).  Thus, for Officer Ingersoll to arrest Mr. Cote for criminal trespass, Mr. Cote had to have committed the trespass in either Officer Ingersoll's presence or in the presence of one of the other Officers.  *McKenney v. Labbe*, 588 A.2d 313, 314 n.3 (Me. 1991) ("Officer Labbe could not base the second arrest [for criminal trespass] on McKenney's entry on the school premises on the morning of November 29, since the entry did not occur in Labbe's presence"); *see Morelli v. Webster*, 552 F.3d 12, 22 (1st Cir. 2009) ("theft is a crime under Maine law, for

which an *observing* officer is empowered to make a warrantless arrest") (emphasis supplied).

Based on the record in this case, the Court readily concludes there is a genuine issue of material fact as to whether Officer Ingersoll had probable cause to arrest Wayne Cote for criminal trespass. Officer Ingersoll argues that a police officer is an "authorized person" when conveying an order to leave and that a police officer may issue an order excluding a person from a large public area. *Ingersoll Mot.* at 3-4. Under *State v. Tauvar*, 461 A.2d 1065 (Me. 1983), Maine law distinguishes between private and public places for purposes of the criminal trespass statute. *Id.* For private places, the owner has the right to exclude anyone even though his entry was "authorized and peaceful," and the "mere demand of the owner constitutes a lawful order for the purposes of the criminal trespass statute." *Id.* at 1067; *State v. Neild*, 2006 ME 91, ¶¶ 12-13, 903 A.2d 339, 342. But for places where the public has been invited, "an order to leave the premises is lawful only when the owner has some justification for requesting removal." *Tauvar*, 461 A.2d at 1067. The owner's authority to demand that a person leave her premises is delegable to a police officer. *State v. Gordon*, 437 A.2d 855, 857 (Me. 1981).

Here, Mr. Cote's girlfriend, as lessee of the apartment, certainly had the right to demand that Mr. Cote leave the apartment, and the police, at her request, had the right to enforce her demand. However, the farther from the girlfriend's apartment, the more questionable the scope of law enforcement authority and the greater the necessary justification. In this case, the police officers had actually

directed Mr. Cote to come to the apartment complex and pick up his belongings, so he was for a time exactly where he was directed to be.  The record reveals that Mr. Cote was parked across the street from the complex when Officer Ingersoll told him to "pick up his stuff."  JSSMF ¶¶ 169-72.  When Mr. Cote complained that the personal property was not his, Officer Ingersoll told Mr. Cote to remove his belongings and if he did not comply with his instructions, he would be arrested for criminal trespass.  JSSMF ¶¶ 173-74.  Mr. Cote was still on a public road across from the complex when Officer Ingersoll told him that he had five minutes and then would be taken to jail.  JSSMF ¶¶ 176, 178.

At this point, the situation is decidedly murky.  It appears that Officer Ingersoll was directing Mr. Cote to pick up property that Mr. Cote said was not his and, if he did not do so, he would be arrested for criminal trespass.  Of course, it is no crime not to pick up someone else's personal property.  Moreover, it is unclear under what authority Officer Ingersoll was acting in telling Mr. Cote that he had to remove himself from a public street or be subject to arrest for criminal trespass.  In any event, Mr. Cote drove away and Officer Ingersoll took no arrest action.

Mr. Cote returned in two minutes and this time he parked in the driveway of the apartment complex.  JSSMF ¶ 185.  He resumed his argument with the officers about whether the property was his and was again told that he had to leave or face arrest.  JSSMF ¶¶ 187-89.  Here, the police were on more solid ground because Mr. Cote was parked in a private driveway.  Whether his girlfriend's authority to exclude Mr. Cote from her apartment could extend to a common privately-owned

driveway is a closer question than whether it could extend to the other side of a public street.  Sergeant Cox then informed Mr. Cox that he had to leave or face arrest.  JSSMF ¶ 190.  After arguing for about five minutes, Mr. Cox left.  JSSMF ¶¶ 190-96.  The police instructions were generally not to "come back"; they did not specify what locations he was forbidden to enter and did not inform him that he could not travel on the roads near 90 Rhode Island Avenue.  JSSMF ¶ 195; PSAMF ¶ 318; DRPSAMF ¶ 318.  Mr. Cote still had not been arrested.

The incident that triggered the arrest was a report that Mr. Cote had returned to the vicinity of 90 Rhode Island Avenue.  JSSMF ¶ 199.  Specifically, a tenant (not the girlfriend) reported to the police that Mr. Cote had stopped in front of 90 Rhode Island Avenue, but on the Cottage Road side of the building.  JSSMF ¶ 216.  It was this action by Mr. Cote that precipitated his arrest for criminal trespass.

Assuming that police officers have the authority to prevent a specific private citizen—as opposed to a general order to all members of the public—from being on a public roadway, under *State v. Anthony*, 2002 ME 94, 794 A.2d 1099, the State would "be required to prove that the order was justified."  *Id.* 2002 ME 94, ¶ 5, 794 A.2d at 1102.  As the Maine Supreme Judicial Court observed in *Anthony*, "[p]roving a not-to-enter order lawful is not a difficult burden on the State."  *Id.* 2002 ME 94, ¶ 6, 794 A.2d at 1102.  "[A] person's misconduct may constitute the basis for a lawful order not to enter a place generally open to the public."  *Id.*

It is true that Mr. Cote was arguing with Officer Ingersoll and the other Officers about whether the property that was left at the curbside of the apartment complex was his property and whether he had the right to enter the apartment to retrieve his belongings, but to argue is not to trespass. In this case, at the very least, whether Officer Ingersoll and Sergeant Cox had the authority to direct Mr. Cote not to remain on a public street under penalty of criminal sanction presents factual questions that prevent summary judgment.

Assuming the order was lawful, a second factual question is what the Officers' "not-to-enter" order was intended to cover. To be guilty of the crime of criminal trespass, the State must prove that the defendant "acted in defiance of a lawful order." *Id.* 2002 ME 94, ¶ 5, 794 A.2d at 1101-02. The Officers told Mr. Cote that he could not enter his girlfriend's apartment, but there is no evidence he did so after the order was issued. They also told him in general terms to leave, but there is no evidence they instructed him that he could not be physically present on another public street near the apartment complex.

The record presents another factual question as to what exactly the Officers said to Mr. Cote and whether in stopping on Cottage Road at the other side of the building, he had acted in defiance of those orders.

Finally, Mr. Cote committed this last act, which triggered the arrest, outside the physical presence of the Officers. There is no evidence that any of the Officers' "senses afford[ed] that officer personal knowledge of facts" that could have justified the arrest. 17-A M.R.S. ¶ 15(2). Mr. Cote had apparently stopped on the other side

of the building out of the Officers' presence and the decision to arrest appears to have come from the report of a third person, which does not comport with the "observing officer" requirement for criminal trespass arrests under Maine law. Although Officer Ingersoll argues that there was sufficient personal knowledge for an arrest based on the Officers' observations that Mr. Cote was "circling," *Ingersoll Mot.* at 8, Sergeant Cox himself acknowledged that mere circling did not constitute a crime or a violation of their no trespass order. JSSMF ¶ 214 ("He's just circling around and around; nothing says he can't do that").

The Court concludes that there are genuine issues of material fact as to whether Officer Ingersoll had probable cause to arrest Wayne Cote for criminal trespass.

### b.    Use of Force

"Excessive force claims are founded on the Fourth Amendment right to be free from unreasonable seizures of the person." *Raiche v. Pietroski*, 623 F.3d 30, 36 (1st Cir. 2010) (citing U.S. Const. amend. IV). "The Fourth Amendment is implicated where an officer exceeds the bounds of reasonable force in effecting an arrest or investigatory stop." *Id.* In *Graham v. Connor*, 490 U.S. 386 (1989), the United States Supreme Court applied an objective reasonableness standard to the use of force by a law enforcement officer during an arrest and held that "*all* claims that law enforcement officers have used excessive force - - deadly or not - - in the course of an arrest . . . of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due

process' approach." *Id.* at 395.  It held that three factors are relevant to determine the reasonableness of the force: (1) "the severity of the crime at issue"; (2) "whether the suspect poses an immediate threat to the safety of the officers or others"; and (3) "whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396; *Raiche*, 623 F.3d at 36.  At the same time, the Supreme Court has observed that "judges should be cautious about second-guessing a police officer's assessment made on the scene, of the danger presented by a particular situation." *Ryburn v. Huff*, __ U.S. __, 132 S. Ct. 987. 992 (2012).  In *Graham*, the Court wrote that reasonableness "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight" and that "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments - - in circumstances that are tense, uncertain, and rapidly evolving." *Graham*, 490 U.S. at 396-97.

In his motion, Officer Ingersoll points out that it was Sergeant Cox who used the Taser against Mr. Cote and Officer Ingersoll argues that his own "use of force was ancillary to the Taser use and minimal." *Ingersoll Mot.* at 10.  He acknowledges "keeping his knee on Plaintiff's back while untangling the leads," but quotes *Graham* as saying that "not every push or shove, even if it may later seem unnecessary in the place of the Judge's chambers, violates the Fourth Amendment." *Id.* (quoting *Graham*, 590 U.S. at 396).

Mr. Cote responds by referring to three *Graham* factors.  *Pl.'s Ingersoll Opp'n* at 10-13.  As to the first *Graham* factor—the severity of the crime, Mr. Cote says

that he "committed no crime" and in any event the only possible crime was criminal trespass, a Class E misdemeanor. *Id.* at 10. As to the second *Graham* factor—the threat to the officers and others, Mr. Cote says that the potential crime in this case was not a crime of violence or the threat of violence, that he made no threats or threatening gestures, and that at the point of his arrest, he had stopped completely and posed no danger to the community. *Id.* at 11. Turning to the final *Graham* factor—active resistance or flight, Mr. Cote maintains that neither applies. *Id.* at 11-12. Finally, Mr. Cote argues that the use of force in this circumstance was contrary to Millinocket Police Department policy. *Id.* at 12-13. In his reply, Officer Ingersoll contends that the use of the Taser was, in fact, consistent with Millinocket Police Department policy and he views the application of the *Graham* factors differently. *Ingersoll Reply* at 5 (adopting *Cox Reply* at 1-3).

The Court views Mr. Cote's application of the *Graham* factors as more convincing. The Court has already determined that whether the Officers had probable cause to arrest Mr. Cote is a question of fact that precludes summary judgment, and viewing the facts in the light most favorable to Mr. Cote, he committed no crime at all before the Officers arrested him. Turning to the second factor, Mr. Cote did not pose a threat to the Officers themselves. The record in this case reveals some vulgar language from Mr. Cote, but there is no evidence that he threatened any of them and no hint that the Officers were concerned for their safety.

86

Mr. Cote posed a couple of risks to others: first, to the trick-or-treaters around 90 Rhode Island Avenue because he was clearly upset and circling the block and second, to his girlfriend because he insisted that he had the right to re-enter her apartment.   But these threats are disconnected to the degree of force the Officers used in arresting Mr. Cote.   The third factor—active resistance or flight—by the time of the arrest, Mr. Cote had stopped and although he was not cooperative, he was not actively resisting the Officers.   To the contrary, again viewing the facts in the light most favorable to him, Mr. Cote was on the phone with the State Police when the Officers broke his window and pulled him from his truck.

Under First Circuit law, the Court may consider the events that have led up to the use of force.   *Young v. City of Providence*, 404 F.3d 4, 22 (1st Cir. 2005); *St. Hilaire v. City of Laconia*, 71 F.3d 20, 26 (1st Cir. 1995).   What makes this case unusual is Officer Ingersoll's banter before Mr. Cote had committed any crime. Officer Ingersoll commented that if they had a chance to stop Mr. Cote, they would "go hands-on" and "put the knuckles to him," JSSMF ¶ 201, and the Officers even discussed using a Taser on the assumption that he would not cooperate.   JSSMF ¶¶ 203-04.   Even though the parties agree that these comments were not a declaration of a premeditated plan to arrest, tase, and assault Mr. Cote, the comments still represent an unusually accurate prediction as to what was to occur.

Still, the force that the Officers used to effect the arrest must be excessive.[41] Here, Mr. Cote complains that the Officers tased him and he points to the Millinocket Police Department policies restricting the use of Tasers to situations where the Officer "reasonably and actually believes it is necessary to effect an arrest" and states that "Officers shall not use [ ] [Tasers]: On individuals operating a motor vehicle, except where exigent circumstances are present."  JSSMF ¶¶ 105, 107.  He also says that Officer Ingersoll kneeled on his back despite Mr. Cote's loud objections about his bad back.   JSSMF ¶¶ 274, 278.   Finally he says he was repeatedly pushed against the hood of his truck after he had been placed in handcuffs.  JSSMF ¶ 276.   Finally, Mr. Cote claims that after he was tased while in the back seat of the cruiser, he began to shake uncontrollably and Officer Ingersoll grabbed his head and forced it between his legs.   JSSMF ¶¶ 280-82.   From the Court's perspective, he has raised a genuine issue of material fact about the amount and nature of the force that Officer Ingersoll used to effect his arrest and Officer Ingersoll's post-arrest actions.

### c.    Qualified Immunity

"Under the doctrine of qualified immunity, police officers are protected from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mlodzinski v. Lewis*, 648 F.3d 24, 32 (1st Cir. 2011) (quoting *Pearson*, 555 U.S. at 230) (internal punctuation omitted).  The First Circuit explained that

---

[41]    There is no suggestion that the Officers here used deadly force and that the preconditions that attach to the use of deadly force have been met.  *See Scott v. Harris*, 550 U.S. 372, 381-82 (2007).

following *Pearson v. Callahan*, 555 U.S. 223 (2009), the Circuit has employed "a two-prong analysis in determining whether a defendant is entitled to qualified immunity." *Id.*  The Circuit asks: "(1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was 'clearly established' at the time of the defendant's alleged violation." *Id.* (quoting *Maldonado*, 568 F.3d at 269).  This latter inquiry itself has two parts: "(a) whether the legal contours of the right in question were sufficiently clear that a reasonable officer would have understood that what he was doing violated the right, and (b) whether in the particular factual context of the case, a reasonable officer would have understood that his conduct violated the right." *Id.* at 32-33.  "A right is clearly established only if 'it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Soto-Torres v. Fraticelli*, 654 F.3d 153, 158 (1st Cir. 2011) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004)).  In other words, a police officer "need not have probable cause necessarily; he need only have reasonably believed that there was probable cause to arrest [the Plaintiff]." *Barber v. Guay*, 910 F. Supp. 790, 799 (D. Me. 1995); *see Anderson v. Creighton*, 483 U.S. 635, 641 (1987); *Burns v. Loranger*, 907 F.2d 233, 237 (1st Cir. 1990).

In the summary judgment context, the First Circuit has noted that the assessment of a claim of qualified immunity requires the reviewing court to make something of an anomalous judgment, deferring to the objectively reasonable beliefs and actions of the defendants, even if they are mistaken, but also drawing all reasonable inferences in the plaintiff's favor. *Mlodzinski*, 648 F.3d at 28.

Here, the Court concludes that "it would be clear to a reasonable officer" that they had no legal right to arrest Mr. Cote for committing a criminal trespass that took place outside their presence and as they had no right to arrest him at all, they had no right to use force to effect an unlawful arrest. The Court concludes that Officer Ingersoll cannot claim the protections of qualified immunity in defense of his actions.

### 2.   The Conspiracy Claim

In Count IV of the First Amended Complaint, Mr. Cote alleges that all the Defendants, including Officer Ingersoll, conspired to interfere with his constitutional rights. *Am. Compl.* ¶¶ 56-57. Officer Ingersoll moves for summary judgment on the ground that there is "no evidence of any conspiracy to violate the rights alleged by the Plaintiff" and no "evidence of conspiracy between Officer Ingersoll and any other officers concerning Plaintiff's arrest, for criminal trespass or the use of force necessary to effect that arrest." *Ingersoll Mot.* at 11. Officer Ingersoll then incorporates arguments in Sergeant Cox's motion. *Id.*

In Sergeant Cox's motion, he first contends that to the extent Mr. Cote is asserting a conspiracy under 42 U.S.C. § 1985(3), his claim must fail because Mr. Cote has not alleged any "racial or [ ] otherwise class-based invidiously discriminatory animus behind the conspirators' actions.'" *Cox Mot.* at 10 (quoting *McDermott v. Town of Windham*, 204 F. Supp. 2d 54, 59 n.9 (D. Me. 2003)). Mr. Cote did not respond to this argument either in Officer Ingersoll's or Sergeant Cox's response and the Court deems any claim under § 1985(c) waived.

Sergeant Cox next turns to § 1983. *Id.* After acknowledging that conspiracies may be actionable under § 1983, he points out that there must be an "actual deprivation of a right secured by the Constitution and laws" and a Plaintiff must "allege and prove both a conspiracy and an actual deprivation of rights; mere proof of a conspiracy is insufficient to establish a claim." *Id.* Regarding the Officers' predictions about what was going to happen, Officer Ingersoll says that Mr. Cote "confuses legitimate police tactical planning, which was remarkably accurate in its prediction of Plaintiff's behavior, with discriminatory conspiracy." *Id.* at 11.

In response, Mr. Cote points out that in order to prove a conspiracy, it is "'not necessary to show an express agreement.'" *Pl.'s Cox Opp'n* at 5 (quoting *Earle v. Benoit*, 850 F.2d 836, 844 (1st Cir. 1988)). Mr. Cote insists that there is sufficient evidence, when the record is viewed in the light most favorable to him, to allow a fact finder to conclude that the Officers, including Officer Ingersoll, conspired against him. *Id.* Among the evidence he points to is that after he left 90 Rhode Island Avenue the second time, the Officers discussed how they planned to stop and arrest him, expressly stating that they would break open his window, "go hands on," and "put the knuckles" to him. *Id.* at 6. This occurred, he claims, despite Sergeant Cox's expressed understanding that he was not doing anything illegal by circling the apartment complex. *Id.* at 7. He claims the conspiracy continued with the failure of Officers Ingersoll and Theriault to mention in their reports his seizure in the cruiser and with one of the Officers influencing the bail commissioner so that

bail was set at $50,000 cash, an extremely high amount for the Class E offense of criminal trespass. *Id.* at 6-7.

The Court agrees with Mr. Cote. A civil rights conspiracy under § 1983 is "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damages." *Earle*, 850 F.2d at 844 (quoting *Hampton v. Hanrahan*, 600 F.2d 600, 620-21) (7th Cir. 1979)) (internal punctuation omitted). Thus, the First Circuit has held that "conspiracies may be actionable under § 1983"; however, "it is necessary that there have been, besides the agreement [among conspirators], an actual deprivation of a right secured by the Constitution and laws.'" *Thore v. Howe*, 466 F.3d 173, 179 (1st Cir. 2006) (quoting *Landrigan v. City of Warwick*, 628 F.2d 736, 742 (1st Cir. 1980)). Here, taking Officer Ingersoll's comments at face value about breaking Mr. Cote's window and going "hands-on" if they had the chance to, it is a factual question whether these comments reflected an agreement among the Officers, which they later carried out despite the fact they did not have probable cause to make an arrest.

### 3.    State Law Claims

In Counts II, Intentional/Negligent Infliction of Emotional Distress, III, Negligence and Assault, and V, Excessive Force, Mr. Cote has asserted state law torts against Officer Ingersoll. *Am. Compl.* at 6-7. In his motion for summary

judgment, Officer Ingersoll raises the discretionary function immunity defense under 14 M.R.S. § 8111.  *Ingersoll Mot.* at 11-12.

> The Maine Tort Claims Act provides in part:

> Notwithstanding any liability that may have existed at common law, employees of governmental entities shall be absolutely immune from personal civil liability for the following:
> …

> C.   Performing or failing to perform any discretionary function or duty, whether or not the discretion is abused; and whether or not any statute, charter, ordinance, order, resolution, rule or resolve under which the discretionary function or duty is performed is valid;

> …

> E.   Any intentional act or omission within the course and scope of employment; provided that such immunity does not exist when an employee's actions are in bad faith . . . .

14 M.R.S. § 8111(1)(C), (E).  In *Richards v. Town of Elliot*, 2001 ME 132, 780 A.2d 281, the Maine Supreme Judicial Court observed that "[i]f the officer uses excessive force in executing an arrest, such action is beyond the scope of the officer's discretion" under § 8111(1)(C).  *Id.* 2001 ME 132, ¶ 32, 780 A.2d at 293. Significantly, the Maine Law Court concluded that "[i]n determining whether a police officer has used excessive force, the same 'reasonableness' factors articulated in *Graham v. Connor* are relevant."  *Id.*

As this Court has concluded that applying the *Graham v. Connor* factors, the excessive force claims under § 1983 may go forward against Officer Ingersoll, the Court arrives at the same conclusion regarding the negligence/assault, intentional infliction of emotional distress, and excessive force counts.  *Steeves v. City of*

*Rockland*, 600 F. Supp. 2d 143, 183 (D. Me. 2009) ("[T]he standard for deciding whether an officer accused of use of excessive force is entitled to MTCA immunity is the same as that for analyzing whether he or she is entitled to qualified immunity with respect to a parallel federal Fourth Amendment claim").   However, under *Richards*, the negligent infliction of emotional distress claim may not proceed.   *Id.* 2001 ME 132, ¶ 34, 780 A.2d at 293 ("[A]ny claim she may have made for the negligent infliction of emotional distress is subsumed in her excessive force claim").

### E.   Sergeant Cox's Motion for Summary Judgment

#### 1.   The Constitutional Claim

##### a.   The Arrest

Applying the principles described earlier, the Court concludes that Mr. Cote has generated genuine issues of material fact as to whether Sergeant Cox had probable cause to believe that Mr. Cote committed the crime of criminal trespass and, in any event, as to whether he was authorized to arrest Mr. Cote for a misdemeanor not committed in Sergeant Cox's or another officer's presence.   Mr. Cote's case against Sergeant Cox on this issue is stronger than his case against Officer Ingersoll because just a few moments before his participation in the arrest of Mr. Cote, Sergeant Cox acknowledged to Chief Bolduc that that Mr. Cote's mere circling did not constitute a crime or a violation of their no trespass order.   JSSMF ¶ 214 ("He's just circling around and around; nothing says he can't do that.").

##### b.   Use of Force

For the reasons previously discussed, the Court concludes that Mr. Cote has generated genuine issues of material fact as to whether Sergeant Cox used excessive force in effecting Mr. Cote's arrest. Again, in some ways the case against Sergeant Cox is stronger than the case against Officer Ingersoll, because Sergeant Cox was the Officer who actually deployed the Taser on Mr. Cote.

### c.     Qualified Immunity

For the reasons previously discussed, the Court concludes that Mr. Cote's claim against Sergeant Cox is not barred by the doctrine of qualified immunity.

### 2.     The Conspiracy Claim

For the reasons previously discussed, the Court concludes that Mr. Cote has raised genuine issues of material fact as to whether Sergeant Cox conspired to deprive him of his civil rights.

### 3.     State Law Claims

For the reasons previously discussed, the Court concludes that with the exception of the negligent infliction of emotional distress claim, Mr. Cote has raised genuine issues of material fact as to whether Sergeant Cox committed the state torts of negligence/assault, intentional infliction of emotional distress, and excessive force counts.

### F.     Officer Theriault's Motion for Summary Judgment

### 1.     The Constitutional Claim

### a.     The Arrest

For the reasons previously discussed, the Court concludes that Mr. Cote has generated genuine issues of material fact as to whether Officer Theriault had probable cause to believe that Mr. Cote committed the crime of criminal trespass and, in any event, as to whether she was authorized to assist arresting Mr. Cote for a misdemeanor not committed in Officer Theriault's or another Officer's presence.

### b.    Use of Force

For the reasons previously discussed, the Court concludes that Mr. Cote has generated genuine issues of material fact as to whether Officer Theriault should be held legally responsible for the excessive use of force against Mr. Cote in effecting his arrest.  Mr. Cote's theory against Officer Theriault differs from his contentions against Sergeant Cox and Officer Ingersoll because there is no evidence that Officer Theriault herself used excessive force against Mr. Cote.  Instead, Mr. Cote argues that Officer Theriault had a duty to intervene to protect him against the use of excessive force by Sergeant Cox and Officer Ingersoll and that she failed to do so. *Pl.'s Theriault Opp'n* at 3.

The First Circuit has long held that "[a]n officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force can be held liable under § 1983 for his nonfeasance." *Gaudreault v. Municipality of Salem*, 923 F.2d 203, 207 n.3 (1st Cir. 1990).  At the same time, Officer Theriault's "mere presence at the scene, without more, does not by some mysterious alchemy render [ ] [her] legally responsible under *section 1983* for the actions of a fellow officer." *Calvi v. Knox Cnty.*, 470 F.3d 422, 428 (1st Cir. 2006).

The line between presence that compels action and mere presence is difficult to define; however, the First Circuit has required that in order to proceed with a failure to intervene claim, a plaintiff must show that the "bystander-officer . . . has a realistic opportunity to prevent the use of excessive force by a fellow officer." *Id.* at 428 n.3.

Here, the evidence against Officer Theriault includes her laughing at Officer Ingersoll's banter about arresting Mr. Cote and putting "the knuckles" to him and her participation in what she knew, or should have known, was an unlawful arrest. Furthermore, she stood by as Sergeant Cox tased Mr. Cote, as Officer Ingersoll kneeled on his back while Mr. Cote screamed in pain, and as he was repeatedly pushed against the hood of his truck. All of this evidence, viewed in the light most favorable to Mr. Cote, generates genuine issues of material fact as to whether she had a realistic opportunity to prevent the use of excessive force by her fellow Officers.

### c.      Qualified Immunity

For the reasons previously discussed, the Court concludes that Mr. Cote's claim against Officer Theriault is not barred by the doctrine of qualified immunity.

### 2.      The Conspiracy Claim

For the reasons previously discussed, the Court concludes that Mr. Cote has raised genuine issues of material fact as to whether Officer Theriault conspired to deprive him of his civil rights.

### 3.      State Law Claims

For the reasons previously discussed, the Court concludes that with the exception of the negligent infliction of emotional distress claim, Mr. Cote has raised genuine issues of material fact as to whether Officer Theriault committed the state torts of negligence/assault, intentional infliction of emotional distress, and excessive force counts.

## IV.   CONCLUSION

The Court ORDERS as follows:

I.   <u>Wayne Cote's Claims Against the town of Millinocket and Chief Bolduc in his Official Capacity</u>

The Court GRANTS with prejudice the Plaintiff Wayne Cote's Motion to Dismiss Count II—Intentional/Negligent Infliction of Emotional Distress; Count III—Negligence—Maine Tort Claims Act—Assault; Count IV—Conspiracy Under 42 U.S.C. § 1983; and Count V—Excessive Force against the town of Millinocket.

The Court GRANTS the town of Millinocket's Motion for Summary Judgment against Count I of the First Amended Complaint (ECF No. 57) and, to the extent the First Amended Complaint states a claim against Don Bolduc in his official capacity as Chief of the town of Millinocket Police Department, the Court GRANTS Don Bolduc's Motion for Summary Judgment against Count I of the First Amended Complaint (ECF No. 60).

The Court GRANTS the town of Millinocket and, in his official capacity, Chief Don Bolduc's Motions for Summary Judgment as to Count VII—Punitive Damages.

II.   <u>Wayne Cote's Claims Against Chief Bolduc in his Individual Capacity</u>

The Court GRANTS Don Bolduc's Motion for Summary Judgment (ECF No. 60) as to all remaining claims in the First Amended Complaint.

### III.     Wayne Cote's Claims Against Kevin Ingersoll

The Court DENIES Kevin Ingersoll's Motion for Summary Judgment as to Counts One, Three, Four, and Five of the First Amended Complaint (ECF No. 58). The Court GRANTS Kevin Ingersoll's Motion for Summary Judgment as to the Negligent Infliction of Emotional Distress claim in Count II and DENIES his Motion for Summary Judgment as to the Intentional Infliction of Emotional Distress claim in Count II.

### IV.     Wayne Cote's Claims Against Jerry Cox

The Court DENIES Jerry Cox's Motion for Summary Judgment as to Counts One, Three, Four, and Five of the First Amended Complaint (ECF No. 59).  The Court GRANTS Jerry Cox's Motion for Summary Judgment as to the Negligent Infliction of Emotional Distress claim in Count II and DENIES his Motion for Summary Judgment as to the Intentional Infliction of Emotional Distress claim in Count II.

### V.     Wayne Cote's Claims Against Janet Theriault

The Court DENIES Janet Theriault's Motion for Summary Judgment as to Counts One, Three, Four, and Five of the First Amended Complaint (ECF No. 61). The Court GRANTS Janet Theriault's Motion for Summary Judgment as to the Negligent Infliction of Emotional Distress claim in Count II and DENIES her

Motion for Summary Judgment as to the Intentional Infliction of Emotional Distress claim in Count II.

SO ORDERED.

_John A. Woodcock, Jr._
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 28th day of September, 2012

100